Rigano LLC
538 Broad Hollow Road, Suite 217
Melville, New York 11747
(631) 756-5900
James P. Rigano, Esq.
Nicholas C. Rigano, Esq.
Alyse M. Delle Fave, Esq.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
LONG ISLAND PURE WATER LTD.

   Plaintiff,

     -against-       Case No.: 18-00727

GOVERNOR ANDREW M. CUOMO,
STATE OF NEW YORK,
NEW YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
UNITED STATES OF AMERICA,     **COMPLAINT**
UNITED STATES DEPARTMENT OF THE NAVY,

   Defendants.      *JURY TRIAL DEMANDED*
---------------------------------------------------------------X

   Plaintiff, Long Island Pure Water Ltd. (the "<u>Plaintiff</u>"), by its counsel, Rigano LLC, as and for its Complaint against Governor Andrew M. Cuomo ("<u>Cuomo</u>"), the State of New York ("<u>NYS</u>"), the New York State Department of Environmental Conservation (the "<u>NYSDEC</u>"), the United States of America (the "<u>USA</u>"), and the United States Department of the Navy (together with the USA, the "<u>Navy</u>" and collectively with Cuomo, NYS, the NYSDEC and the USA, the "<u>Defendants</u>") allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

   The failures of Governor Cuomo, the NYSDEC and the Navy have caused an environmental catastrophe jeopardizing the health and safety of the citizens of Bethpage and its future generations.  Defendants are parties authorized to investigate and remediate contamination

1

emanating from the sites formerly operated by Grumman and the Navy in Bethpage, New York (as hereinafter defined, the "Bethpage Facilities").

For over thirty (30) years, however, Defendants have enabled a plume of radioactive material exceeding government standards to spread in the groundwater. As citizens of Bethpage (and all of Long Island) draw their water from the groundwater, these failures have led to an imminent and dire circumstance in Bethpage and surrounding communities. At least one public drinking water supply well has already been shut down due to the detection of radioactive material in the well. There is also significant concern that an odorless and colorless radioactive gas is upwardly migrating from the contaminated groundwater into homes, businesses and schools.

Governor Cuomo, the NYSDEC and the Navy have completely failed to investigate the radioactive material in the subsurface despite the following indisputable facts:

- The Navy's and Grumman's own records clearly evidence that radioactive material, including Radium, was extensively used at the Bethpage Facilities for decades;

- Grumman "misplaced" two pieces of equipment, called Alnor Detectors, each containing radioactive material at **1.3 million times** acceptable levels. The location of these detectors remains unknown today;

- Defendants have been in possession of documents evidencing use of radioactive material at the Bethpage Facilities since at least 2013 and likely since 2001 (discovery will reveal precisely when Defendants possessed these documents);

- Each location with an exceedance of government standards is in a south easterly direction from the Bethpage Facilities. Groundwater flows in a south easterly direction from the Bethpage Facilities;

- Radium has been found to be in excess of standards acceptable to human health in the groundwater in at least fifteen (15) sampling locations southeast of the Bethpage Facilities. The furthest detected exceedance is approximately two (2) miles from buildings at the Bethpage Facilities where radioactive materials

were reportedly used, suggesting the radioactive plume extends from the Bethpage Facilities to at least that area;

- Radium decays to Radon, an odorless and colorless radioactive gas, which may upwardly move from groundwater through the soil and enter homes, businesses, and schools. According to the Environmental Protection Agency ("EPA"), Radon is the second leading cause of lung cancer in the United States, causing 22,000 deaths annually.

Plaintiff has retained a professional hydrogeologist and a professional engineer with a combined sixty (60) years of Long Island subsurface contamination experience.  These experts have analyzed all known information with respect to the radioactive material in the Plume and have issued a report, which has been shared with Defendant NYSDEC.  The report reveals the experts' joint conclusion that an investigation of the radioactivity is not only necessary, but crucial to ensure the protection of the public health and the public drinking water supply.

Instead of conducting an investigation, Defendant NYSDEC has *delisted* 97% of the Bethpage Facilities acreage (ie. 588 of the original 605 acres) from investigatory and remedial activity. More troubling, Defendants have required the use of "wellhead treatment" to treat contaminants at public drinking water supply wells instead of directly extracting the contaminants from the subsurface. Wellhead treatment is completely ineffective when the full extent of contaminants is not known, putting the public in grave danger of drinking radioactive water.[1]

Defendants have had numerous opportunities to address the radioactive material present in the subsurface, but have elected not to. Indeed, Defendants NYSDEC and Navy have been respectively mandated by the New York State Legislature and the United States Congress to issue reports to facilitate an investigation of *all* contaminants in the subsurface.  Yet, despite their apparent knowledge, neither NYSDEC nor the Navy made a single mention of any radioactive material or potential associated concerns in their respective reports.

---

[1]     This is evidenced by the closure of a public drinking water supply well within the Plume being shut down in 2013 due to elevated levels of Radium.

Further Governor Cuomo held a press conference on December 21, 2017 where he announced New York State's plan to proceed with containment and remediation of the Plume. During that event, Governor Cuomo listed twenty-four (24) contaminants of concern, but made no mention of Radium or any radioactive material.

Defendants have evidenced their apathy.  Absent judicial intervention, this environmental catastrophe will continue to expand, causing harm to more citizens, future generations, and our environment.  This suit for declaratory and injunctive relief against Defendants is being brought by Plaintiff, a citizens group with numerous members residing within the confines of the Plume, to address Defendants' violations of RCRA, CERCLA and the ECL (each defined below). Plaintiff demands, among other things, that an investigation of radioactive material be conducted. Plaintiff requests authorization to, among other things, spearhead the investigation as Defendants cannot be trusted.

## JURISDICTION AND VENUE

1.   Plaintiff brings this civil suit pursuant to: (i) the citizen suit enforcement provisions of Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, (ii) the citizen suit enforcement provisions of Section 310 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9659, (iii) section § 71-2705 of the New York State Environmental Conservation Law (the "ECL"), and (iv) other applicable law.

2.   This Court has subject matter jurisdiction over the parties and this action pursuant to those statutes and 28 U.S.C. § 1331.

3.   Venue properly lies in the Eastern District of New York pursuant to Section 310(b)(1) of CERCLA, (42 U.S.C. § 9659(b)(1)) and pursuant to Section 7002(a) of RCRA, (42 U.S.C. § 6972(a)) because the source of the violations occurred in this District.

4.   On September 8, 2017, Plaintiff notified Defendants of its intention to file suit for violations of RCRA, in compliance with the statutory notice requirements set forth in 42 U.S.C. § 6972(b)(2)(A), and the corresponding regulations set forth in 40 C.F.R. Part 254.

5.   In the September 8, 2017 notice letter, Plaintiff also notified Defendants of its intention to file suit for violations of CERCLA, in compliance with the statutory notice requirements set forth in 42 U.S.C. § 9659(d)(1), and the corresponding regulations at 40 C.F.R. Part 374.

6.   More than ninety (90) days have elapsed since Plaintiff served the September 8, 2017 notice letter on Defendants, during which time none of the Defendants have commenced action to redress the RCRA violations alleged in the notice letter which are reiterated in this complaint.

7.   More than sixty (60) days have elapsed since Plaintiff served the September 8, 2017 notice letter on Defendants, during which time none of the Defendants have commenced action to redress the CERCLA violations alleged in the notice letter which are reiterated in this complaint.

## PARTIES

### I.   Plaintiff

8.   Plaintiff Long Island Pure Water Ltd. is a nonprofit community organization formed under the laws of the State of New York for the purpose of promoting pure water for the

benefit of individuals who reside and visit Long Island through management, negotiations, legal proceedings and other activities.

9.   Plaintiff Long Island Pure Water Ltd. currently has over seventy (70) members, a majority of whom reside in the Bethpage area and above the Plume (as defined below).

10.  Plaintiff has retained professionals with extraordinary subsurface contamination experience.

11.  Plaintiff has retained the undersigned counsel who, for approximately thirty (30) years, has represented parties with respect to major subsurface investigations and remediation on Long Island, among other locations.

12.  Plaintiff has also retained a professional hydrogeologist and a professional engineer, who have in excess of sixty (60) years of combined experience with subsurface contamination investigations and remediation on Long Island, among other locations.

## II.   Defendants

13.  Defendant Andrew M. Cuomo is the Governor of New York State whose duties include the enforcement of state laws and the supervision of state agencies, including Defendant NYSDEC.

14.  Defendant Cuomo has been the Governor of New York since 2011.

15.  Defendant NYS is a state within the United States which, through Defendants Cuomo and NYSDEC, has failed to investigate and remediate the radioactive materials in the Plume.

16.  Defendant NYSDEC is the lead state environmental agency with the responsibility of carrying out the policy of the State of New York to conserve, improve and protect its natural resources and environment and control water, land, and air pollution consistent

with the authority granted to the Department and the Commissioner by Article 1, Title 3 of the ECL.

17. For over thirty (30) years, Defendant NYSDEC has been the lead government agency in charge of investigating and remediating the subsurface contamination emanating from the Bethpage Facilities that has caused the Plume.

18. Defendant NYSDEC has failed to adequately investigate and remediate the contaminants in the Plume, including newly discovered radioactive material.

19. Defendant United States of America is the sovereign nation which, through the Department of the Navy, occupied the Bethpage Facilities, caused significant contamination resulting in the Plume and has failed to investigate and remediate the radioactive materials in the Plume.

20. Defendant United States Department of the Navy is a former owner and operator, as defined in 42 U.S.C § 9601(20)(A), of the Bethpage Facilities and a named a potentially responsible party ("PRP") with CERCLA liability under 42 U.S.C § 9607, as well as, liability under Article 27 of the ECL, for activities conducted at the Bethpage Facilities.

21. Defendant Navy has failed to adequately investigate and remediate the contaminants in the Plume, including newly discovered radioactive material.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

### A. History of Operations at the Bethpage Facilities

22. Beginning in the early 1940's, Northrop Grumman, formerly Grumman Aerospace Corporation and Grumman Aircraft Engineering Corporation ("Grumman") and the Navy occupied approximately 605 acres in Bethpage, New York (the "Bethpage Facilities").

23. The Naval Weapons Industrial Reserve Plant ("NWIRP") was a government owned, Navy occupied, and contractor operated facility consisting of approximately 105 acres of the 605 acres.

24. The remaining 500 acres of the Bethpage Facilities were owned by Grumman.

25. Operations at the Bethpage Facilities included, among other things, research, prototyping, testing, design engineering, fabrication and primary assembly of military aircraft.

26. During the many decades of operations at the Bethpage Facilities, Defendant Navy and Grumman used, spilled, and/or otherwise discarded hazardous materials into the surrounding soils.

27. Where pollutants are disposed of in a certain location, those pollutants may leach down through the soil and reach the groundwater.

28. The groundwater, with its natural movement, can carry those pollutants through the subsurface, spreading them across a wide area.

29. In the area of the Bethpage Facilities groundwater flows in a southeasterly direction.

30. The flowing groundwater has spread the hazardous materials used, spilled, and/or discarded by Defendant Navy and Grumman over a wide spread area creating a Plume of pollutants in the Bethpage area emanating from the Bethpage Facilities (the "Plume").

31. The Defendants have confirmed the existence of the Plume.

32. In 1983, Defendant NYSDEC listed the Bethpage Facilities as a New York State Inactive Hazardous Waste Site (Site No. 130003).

33. The Bethpage Facilities are also subject to cleanup under RCRA.

34.  In 1993, Defendant NYSDEC divided the Bethpage Facilities into the Grumman sites (#130003A and #130003C) and the 105 acre Navy NWIRP site (#130003B).

35.  The Bethpage Facilities are all currently listed as Class 2 Inactive Hazardous Waste Sites meaning, "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment."

36.  In 2017, Defendants Cuomo and NYSDEC acknowledged that the Plume of twenty four (24) pollutants emanating from the Bethpage Facilities covers a six (6) square mile area.

37.  The groundwater Plume emanating from the Bethpage Facilities is approximately three (3) miles long, two (2) miles wide, and nearly 800 feet deep.

38.  There are approximately twenty five (25) public and private drinking supply wells located to the south-southeast of the Bethpage Facilities that supply drinking water to tens of thousands of people.

39.  Several public drinking water supply wells are known to be threatened by the Plume.

40.  The United States Environmental Protection Agency ("EPA") designated the Nassau-Suffolk aquifer system a sole-source aquifer in 1975, meaning that all drinking water supplies for the Long Island public, including those in Bethpage, are drawn from the Nassau-Suffolk groundwater aquifer system.

**B.  The Presence of Radioactive Material Emanating From the Bethpage Facilities**

41.  Radium is a radioactive metal that exists in thirty four (34) known isotopes.

42.  All isotopes of radium are radioactive.

43. Two of the most hazardous Radium isotopes found in the environment are Radium-226 and Radium-228 (together, "Radium").

44. Radium-226 has a half life of 1600 years, meaning a mass of Radium-226 decays by fifty percent (50%) every 1600 years.

45. Radium-228 has a half life of 5.75 years, meaning a mass of Radium-228 decays by fifty percent (50%) every 5.75 years.

46. According to the EPA and Defendant NYSDEC, Radium is a hazardous substance.

47. According to the EPA and Defendant NYSDEC, Radium is a hazardous waste when disposed.

48. The maximum contaminant level ("MCL") established by the EPA and Defendant NYSDEC for Radium-226 and Radium-228 is a combined five (5) picocuries per liter (pCi/L).

49. MCLs are enforceable standards which represent the highest level of a contaminant that is allowed in drinking water.

50. According to the EPA and Defendant NYSDEC, Radium quantities exceeding the MCL in the drinking water supply is hazardous to human health.

51. According to the EPA and Defendant NYSDEC, Radium quantities exceeding the MCL in the drinking water supply is hazardous to the environment.

52. According to a fact sheet issued by the EPA, exposure to Radium can result in an increased incidence of bone cancer, liver cancer, breast cancer, lymphoma, and hematopoietic diseases (e.g. leukemia and aplastic anemia).

53. Radium is not expected to naturally exceed the MCL on Long Island.

54. According to the EPA, Radium does not naturally occur in excess of the MCL on Long Island.

### a. Numerous Radium Samples Have Exceeded the MCL Within the Plume

55. The local water district's public drinking water supply well 4-1 is located southeast of the Bethpage Facilities and in the precise direction of the groundwater flow therefrom.

56. The local water district's public drinking water supply well 4-2 is located southeast of the Bethpage Facilities and in the direction of the groundwater flow therefrom.

57. On August 14, 2012, the local water district detected Radium in public drinking water supply well 4-1 at 4.72 pCi/L, just below the MCL.

58. According to the local water district's 2012 Water Quality Data report, the local water district appears to have detected Radium in public drinking water supply wells 4-1 and 4-2 at levels above the MCL in 2012.

59. According to the local water district's 2013 Water Quality Data report, the local water district appears to have detected Radium in public drinking water supply well 4-1 at levels above the MCL in 2013.

60. In or shortly prior to May 2013, the local water district shut down public drinking water supply well 4-1 from service due to elevated detections of Radium in that drinking water supply well.

61. Pursuant to 42 U.S.C. § 9618, CERCLA requires that high priority be given to facilities where the release of contaminants has resulted in the closing of drinking water wells or has contaminated a principal drinking water supply.

62. On December 7, 2015, Bethpage public drinking water supply well 4-1 detected levels of Radium at 5.92 pCi/L, 5.55 pCi/L and 5.21 pCi/L, all of which exceed the MCL.

63.  Upon information and belief, both Radium-226 and Radium-228 were not simultaneously tested in any public drinking supply well in Bethpage from 1990 to 2012.

64.  Upon information and belief, simultaneous sampling results for both Radium-226 and Radium-228 in any public drinking supply well in Bethpage were not revealed to the public from 1990 to 2012.

65.  The Plume has been migrating for approximately thirty (30) years.

66.  Bethpage High School and Central Boulevard Elementary School are two (2) public schools located in Bethpage and within the Bethpage School District.

67.  Both Bethpage High School and Central Boulevard Elementary School are located within the confines of the Plume.

68.  In June 2017, the Bethpage School District released sampling results from three (3) groundwater monitoring wells at Bethpage High School showing Radium detected at levels ranging from 10.46 pCi/L to 24.74 pCi/L, approximately two (2) to five (5) times the MCL.

69.  In August 2017, the Bethpage School District released sampling results from three (3) groundwater monitoring wells at Bethpage High School showing Radium detected at levels ranging from 9.63 pCi/L to 23.95 pCi/L, approximately two (2) to five (5) times the MCL.

70.  In August 2017, the Bethpage School District released sampling results from three (3) groundwater monitoring wells at Central Boulevard Elementary School showing Radium detected at levels ranging from 12.19 pCi/L to 32.18 pCi/L, approximately two (2) to six (6) times the MCL.

71.  At least twelve (12) additional samples taken in the Bethpage area from 2013 to 2016 reveal further exceedances of the Radium MCL ranging from 5.23 pCi/L to 8.59 pCi/L.

72. Each of the Radium sampling exceedances of the MCL is located within the confines of the Plume.

73. Other than being posted online without adequate disclosure to the public, Defendants have not conveyed or explained the Radium exceedances discussed above to the public in any form, whether written, oral or at any of Defendants' numerous public meetings regarding the Plume.

74. None of the Defendants have conducted a formal investigation of radioactive material in the subsurface or indoor air at, around, or emanating from the Bethpage Facilities.

**b.       Soil Vapor Intrusion**

75.  A major concern with soil and groundwater contamination is the potential for the contaminants to evaporate into the air spaces within the soil and then move upwardly into overlying buildings and affect indoor air quality.

76. This process, called soil vapor intrusion, is particularly alarming in this case because Radium-226 decays to a radioactive gas, Radon-222 ("Radon").

77. Radon can move upwardly through soil and may impact indoor air quality by migrating through cracks in the foundations of buildings and homes.

78. Radon is a colorless, tasteless and odorless gas that can only be measured through the use of proper test procedures.

79.  Radon is a known carcinogen.

80.  Radon is the second leading cause of lung cancer in the United States, resulting in an estimated 22,000 lung cancer deaths annually.

81.   According to a New York State Department of Health fact sheet, Radon can also be dissolved in groundwater and be introduced into the indoor air through the aeration of well water during its use in washing machines, showers, and cooking.

82.   In the subsurface, Radon naturally emits from granitic rocks (e.g. granite), which, throughout the United States, primarily lies in subsurface bedrock.

83.   Areas throughout the United States are susceptible to hazardous levels on Radon where the bedrock is at or just beneath the surface.

84.   According to the EPA, Long Island, and particularly Bethpage, is generally not at risk for naturally occurring Radon contamination mainly because the bedrock lies far beneath the surface.

85.   According to the EPA, Radon is generally expected to be at levels below 2.0 pCi/L on Long Island.

86.   The EPA has set a recommended indoor air action level for Radon at 4.0 pCi/L.

87.   Despite the known Radium-226 contamination, none of the Defendants have conducted sub slab or indoor air testing for Radon at the Bethpage Facilities or throughout the surrounding Bethpage area to date.

88.   Only the Bethpage School District has conducted isolated Radon sampling at two (2) of its schools: Bethpage High School and Central Boulevard Elementary School.

89.   The Bethpage High School results revealed substantially elevated indoor air levels of Radon as high as 3.8 pCi/L and 3.9 pCi/L, an amount twice what the EPA suggests is typical for Long Island.

90.   These elevated levels are indicative of a Radon (and Radium-226) source, as opposed to naturally occurring background levels of Radon, which as stated *supra*, are typically low (< 2.0 pCi/L) on Long Island.

91.   The elevated levels of Radium and Radon found at Bethpage High School emphasize the need for a thorough investigation of Radon in the groundwater, soil and soil vapor, as the nature and extent of Radon contamination has not been delineated.

92.   In addition, on September 29, 2017 the Bethpage School District released a statement revealing that the Bethpage School District tested for Radon in the indoor air at the Central Boulevard Elementary School due to the school's location within the Plume.

93.   The September 29, 2017 statement further reveals that over the summer of 2017 the Bethpage School Board authorized the installation of a vapor barrier at Central Boulevard Elementary School "to keep out any potential volatile organic compounds, including the possibility of radon."

94.   A vapor barrier is generally installed by a party to prevent hazardous soil vapor from migrating into indoor air.

95.   Vapor barriers are generally only installed once a party learns that a property has a soil vapor issue that may affect indoor air quality.

96.   Upon information and belief, the Bethpage School District authorized the installation of a vapor barrier at the elementary school because the prior test revealed elevated Radon levels.

97.   Upon information and belief, Defendant NYSDEC is aware of the Bethpage School District's Radon sampling and results.

98.  Upon information and belief, Defendant Navy is aware of the Bethpage School District's Radon sampling and results.

99. Defendants have failed to formally investigate Radon contamination in the Bethpage area.

100.  A formal investigation of Radon throughout the Bethpage area is imperative.

101.  Until such contamination is investigated and remediated, the citizens of Bethpage are at risk of exposure to hazardous levels of Radon through water used and air breathed in their homes, schools and businesses.

c.      **Grumman's Verified Extensive Use of Radioactive Materials at Bethpage Facilities**

102. On September 28, 2016, Grumman's counsel sent a letter to Defendant NYSDEC, which among other things, enclosed a report (the letter together with the report shall hereinafter be referred to as the "Grumman 2016 Letter") completed by Grumman's own retained expert, Donald J. Carpenter ("Carpenter").

103.  The Grumman 2016 Letter revealed Grumman's extensive use of radioactive materials at the Bethpage Facilities during its period of operations.

104.   Grumman did not disclose or produce any records discussed in the letter or relied on by its counsel or Carpenter.

105.   In the Grumman 2016 Letter, Grumman's counsel refers to files reviewed by its firm and Carpenter containing information relating to:

> Licenses from the NYS Department of Labor and related correspondence; specific quality-control and research projects using radionuclides; inventories of radionuclides; manifests and disposal permits for radionuclides; equipment containing radionuclides; decommissioning of facilities that contained radionuclides; routine monitoring of employees for exposure to radiation; luminescent aircraft/spacecraft components; reference

> materials explaining company or government rules for handling
> and/or disposal of radionuclides; routine employee exposure
> monitoring records; records containing optical radiation; and
> records regarding radiation-related equipment containing no facial
> reference to radionuclides.

Grumman 2016 Letter, p. 2.

106.  Carpenter was retained and paid by Grumman, not the NYSDEC or an independent third party.

107.  Carpenter has not been cross examined.

108.  No independent expert reviewed the Grumman records that were reviewed and/or relied upon by Grumman's counsel and Carpenter.

109.  No independent expert opined on Grumman's counsel's and/or Carpenter's conclusions set forth in the Grumman 2016 Letter.

110.  No independent expert opined on Grumman's counsel's and/or Carpenter's conclusions set forth in the Grumman 2016 Letter in writing.

111.  In the 2016 Grumman Letter, Grumman admits radioactive materials, particularly Radium, were used at the Bethpage Facilities to, among other things, manufacture luminescent aircraft dials.

112.  In the 2016 Grumman Letter, Carpenter stated that Grumman's records indicated the presence and use of nearly fifty (50) radionuclides, including Radium, at the Bethpage Facilities during various periods of Grumman's and the Navy's operations from the 1960s through 2015.

113.  In the Grumman 2016 Letter, Grumman concedes that its records only date back to the early 1960's.

114.  Grumman's operations began in Bethpage around 1940, leaving nearly twenty (20) years of unrecorded operations.

115.  Carpenter discusses that two of Grumman's Alnor detectors were "misplaced" in 1974.

116.  Carpenter reveals that at the time the Alnor detectors were "misplaced" each reportedly contained a Radium-226 source measured at 6.25 microCurie, an amount equivalent to 6,250,000 picoCurie.

117.  The missing Alnor detectors may be a significant source of the Radium contamination in the subsurface.

118.  As Defendants have failed to conduct adequate due diligence and investigate radioactive materials in the subsurface emanating from the Bethpage Facilities, the locations of these Alnor detectors remain unknown today.

119.  In the Grumman 2016 Letter, Carpenter admitted that he did not conduct a full "cradle to grave" review, and acknowledged both Grumman's use of Radium and the existence of Radium exceedances within the Plume.

120.  Yet Carpenter incredibly opined in conclusory fashion that Grumman's activities at the Bethpage Facilities could not be the source of the Radium detected in the groundwater in the area.

121.  Grumman's use of Radium, combined with the sampling results showing Radium exceedances at locations that are south-easterly of the Bethpage Facilities, which is the precise direction of groundwater flow, demonstrate that the Bethpage Facilities is the likely source of the existing radionuclide contamination that continues to spread.

122.  The Grumman 2016 Letter was provided in response to a NYSDEC inquiry to Grumman to produce radioactive materials records.

123.  Defendant NYSDEC failed to release the Grumman 2016 Letter to the public until June 22, 2017, nearly ten (10) months after it was received by the NYSDEC and only after Emily Dooley, a Newsday reporter, obtained the Grumman 2016 Letter through a FOIL request and published a Page 1 article in Newsday on June 22, 2017 about its content.

124.  Upon information and belief, Defendant NYSDEC is in possession of records evidencing Grumman's use of radioactive materials as referenced in the Grumman 2016 Letter.

125.  To date, Defendant NYSDEC has not publicly released any statements or reports regarding the information contained in the records evidencing Grumman's use of radioactive materials at the Bethpage Facilities.

### d. Activities at Plant 26 and Building 10 Further Confirm the Use of Radioactive Materials at the Bethpage Facilities

126.  Additional documents further confirm the use of radioactive materials at the Bethpage Facilities.

### i. The 2000 Arcadis Phase I

127.  A Phase I Environmental Site Assessment on Plant 26 ("Plant 26"), one of the buildings located within the Bethpage Facilities, was prepared in 2000 by Arcadis Geraghty & Miller (the "2000 Arcadis Phase I").

128.  The 2000 Arcadis Phase I provides details as to the operations that occurred in Plant 26.

129.  Appendix F of the 2000 Arcadis Phase I contains a letter from Grumman to the New York State Department of Labor ("NYSDOL") dated February 25, 1999.

130. The letter states, "[s]ince loose radioactive materials are no longer being used anywhere in this building (nor anywhere else within our installation), the purpose of this decommissioning effort was to ensure that no residual radioactivity in excess of current guidelines exist in the building."

131. This statement not only verifies that Grumman used radioactive materials at the Bethpage Facilities, but also reveals that the use of radioactive materials was not limited to sealed sources, as "loose" radioactive materials were used.

132. The 2000 Arcadis Phase I identified a restricted partial basement area and one room of Plant 26 where the contents and uses of the room were reportedly classified.

133. This room is referred to as a "black room" meaning only United States Department of Defense personnel and those with high security clearance were granted access.

134. Upon information and belief, Defendant NYSDEC has been in possession of the 2000 Arcadis Phase I since no later than 2001.

135. Upon information and belief, Defendant NYSDEC has known of the content and information contained in the 2000 Arcadis Phase I regarding the use of radioactive materials at Plant 26 since no later than 2001.

## ii.      The Radioactive Materials License

136. A Grumman memorandum dated June 4, 1998 discusses the deactivation of the 105 acre Navy parcel, which included Building 10 ("Building 10"), a building within the Bethpage Facilities, and the filling and capping of a Neutron Generator Pit  located at that building.

137.  According to that memorandum, Grumman obtained and operated under NYSDOL license # 733-0291 which, upon information and belief, authorized the handling of certain radioactive materials.

138.  By letter dated June 5, 1998 sent by Grumman to the NYSDOL, Grumman discussed the final decommissioning survey for Building 10, which Grumman stated "indicat[es] no residual radioactive contamination."

139.  By that June 5, 1998 letter, Grumman requested that NYSDOL release Building 10 from radiological control relying upon a decommissioning report dated May 1998 for Building 10 prepared by Cophysics Corporation.

140.  Plaintiff submitted a Freedom of Information Act request to NYSDOL and the New York State Department of Health ("NYSDOH") seeking the production of the Cophyics Corporation decommissioning report.

141.  The NYSDOL and the NYSDOH each responded to that Freedom of Information Act by stating that they did not have the Cophyics Corporation decommissioning report in their possession.

142.  Upon information and belief, Defendant NYSDEC did not consider the Cophyics Corporation prior to delisting Building 10 from investigatory and remedial activity.

143.  The June 5, 1998 letter reveals that radioactive contamination existed at Building 10.

144.  By letter dated June 8, 1998 sent by the NYSDOL to Grumman, the NYSDOL approved the release of Building 10 from radiological control.

145.   Upon information and belief, the subsurface of the Bethpage Facilities and/or the surrounding area were not investigated for radioactive materials prior to NYSDOL releasing Building 10 from radiological control.

**C. Plaintiff's Experts Have Opined that an Investigation is Crucial to Ensure the Protection of Public Health**

146.   Plaintiff retained a professional hydrogeologist.

147.   Plaintiff's retained professional hydrogeologist has over thirty (30) years of subsurface investigation and remediation experience on Long Island.

148.   Plaintiff also retained a professional engineer.

149.   Plaintiff's retained professional engineer has over thirty (30) years of subsurface investigation and remediation experience on Long Island.

150. On November 21, 2017, Plaintiff's retained hydrogeologist and professional engineer (together, "Plaintiff's Experts") released a report ("Plaintiff's Expert Report") summarizing the technical data and information on Radium, including all information discussed *supra*.

151.   In Plaintiff's Expert Report, Plaintiff's Experts state that in their many years of experience working on Long Island, there has never been another instance in which a public drinking water supply well was forced to be shut down due to Radium contamination, like well 4-1.

152.   Plaintiff's Expert Report further reveals that high capacity water supply wells, like the local water district's public drinking supply well 4-1, draw water from a large volume and dilute contaminants arriving at the well, indicating there is likely a high concentration of Radium arriving at the well and supporting the conclusion that Radium levels in the well are not natural.

153. Within Plaintiff's Expert Report, Plaintiff's Experts mapped out all of the locations where Radium was sampled by Defendants.

154. The map reveals that all sampling points that detected Radium above the MCL are within the Plume.

155. Conversely, there were no sampling points that detected Radium above the MCL upgradient (north) or sidegradient (west) of the Bethpage Facilities, supporting the conclusion that the source of the Radium contamination is the Bethpage Facilities.

156. Plaintiff's Experts also address how the Radium levels detected at the Bethpage High School could explain the abnormally high levels of Radon gas detected in the school building.

157. Based on the review of the existing data, Plaintiff's Experts conclude that further investigation of the radionuclide contamination within the Plume is not only necessary, but crucial to ensure the protection of the public health and the drinking water supply.

158. On December 1, 2017, Defendant NYSDEC was provided with Plaintiff's Expert Report.

159. Since receiving Plaintiff's Expert Report, Defendant NYSDEC has failed to act.

**D. Defendant Cuomo's and Defendant NYSDEC's Failures**

160. Defendant NYSDEC is the lead state environmental agency in charge of overseeing Plume management, investigation and remediation.

161. Defendant NYSDEC is, and for over thirty (30) years has been, the lead agency in charge of overseeing the investigation and remediation of all contamination emanating from the Bethpage Facilities.

162. Defendant NYSDEC has failed the public by not adequately investigating and remediating the radioactive materials in the Plume.

163. Defendant NYSDEC has failed the public by not adequately remediating all hazardous substances in the Plume.

164. It has been over thirty (30) years since the Bethpage Facilities were first listed as a New York State Superfund site.

165. From 1995 to 2013, Defendant NYSDEC published three (3) Record of Decisions ("ROD") in relation to remediation of the Bethpage Facilities.

166. Each ROD is a final determination by the NYSDEC and provides the NYSDEC's selected method of remediation.

167. None of the three (3) RODs issued by Defendant NYSDEC mention radioactive materials or the use, treatment, investigation or remediation thereof.

168. Under NYSDEC oversight, the Plume has continued to spread and move with the groundwater.

169. Today the Plume is reported to be approximately three (3) miles long by two (2) miles wide, an environmental catastrophe that should have undoubtedly been prevented.

170. Defendant NYSDEC's unsuccessful attempts at containing and remediating the Plume has lead to a devastating impact to Long Island's sole source aquifer and placed tens of thousands of citizens at risk of exposure to contaminated drinking water.

    a.    **NYSDEC's Delisting of Portions of the Bethpage Facilities Without Adequate Investigation**

171. Since 2011, Defendant NYSDEC has operated under Defendant Cuomo's oversight.

172.   As the lead agency in charge of overseeing investigation and remediation, Defendant NYSDEC has authority to delist certain portions of a Superfund site once investigation of those areas is deemed complete and remediation concluded.

173.   During the early 1990's, many portions of the Bethpage Facilities were delisted as investigation and remediation of the areas were allegedly completed.

174.   On March 13, 1995, Grumman's consultant, Dvirka and Bartilucci, sent the NYSDEC a New York State Site Registry Delisting Petition for buildings within the Bethpage Facilities, including Plant 26.

175.   This March 13, 1995 Delisting Petition reveals that radioactive materials were not sampled for at Plant 26 or any other buildings listed in the Petition.

176.   Upon information and belief, on June 1, 1995, Defendant NYSDEC approved the delisting of Plant 26 from the registry of Inactive Hazardous Waste Sites without requiring an investigation for radionuclide contamination.

177.   At the time Plant 26 was delisted, Grumman was authorized by an active NYSDOL license (discussed *supra*) to use loose and sealed radioactive materials at Plant 26.

178.   On March 15, 1999 Plant 26 was released from NYSDOL's radiological control, nearly four years *after* it was delisted by Defendant NYSDEC.

179.   Defendant NYSDEC permitted Plant 26, an apparent building which served as a sanctuary for radioactive materials, to be delisted without testing for radioactive materials.

180.   Today, the Grumman site consists of only nine (9) acres from the original 500 and the NWIRP site consists of only 8.7 acres from the original 105.

181.  This drastic reduction in Superfund site acreage without adequate investigation of the subsurface leads Plaintiff to question the integrity of each of Defendant NYSDEC's delisting decisions.

182.  More troubling, Defendant NYSDEC is now conflicted to adequately investigate and fully remediate the Plume due to its prior failures, and interest to avoid public backlash for its grossly negligent and irresponsible delisting decisions.

183.  Defendant NYSDEC likewise failed to make publicly available Defendant Navy's records (discussed *infra*) it had in its possession since 2013, which revealed the use of radioactive material at the Bethpage Facilities, until Newsday revealed Defendant NYSDEC's possession of such documents in 2017.

184.  Upon information and belief, Defendant NYSDEC is only in possession of records produced by Defendant Navy with respect to the use of radioactive materials at the Bethpage Facilities during the period of 2003 forward, leaving approximately seventy (70) years of undocumented operations.

185.  Upon information and belief, after reviewing the produced documents, Defendant NYSDEC failed to demand records from Defendant Navy for the seventy (70) year undocumented period, as Defendant Navy commenced operations in the early 1940s.

### b. Defendant NYSDEC's and Defendant Cuomo's Violations of New York State Superfund Statues and Regulations

186.  Defendant NYSDEC's consistent disregard of the radioactive materials in the subsurface emanating from the Bethpage Facilities supports the conclusion that Defendant NYSDEC cannot be trusted to properly investigate and remediate the Plume for the benefit of the public.

187.  Defendant NYSDEC's and Defendant Cuomo's failures amount to numerous violations of New York state environmental statutes and regulations.

188.  Defendant NYSDEC's and Defendant Cuomo's failure is in direct contravention to the duties imposed upon them by applicable law.

189.  These violations have contributed to the imminent and substantial endangerment the Plaintiff and the citizens of Bethpage and surrounding communities are faced with today.

### i.  Violation of ECL § 27-1305

190.  Under § 27-1305(b) of the ECL, Defendant NYSDEC is obligated, based upon new information received, to reassess by March 31st of each year, the relative need for action at each site to remedy the environmental and health problems resulting from the presence of hazardous wastes at such sites.

191.  Defendant NYSDEC and Defendant Cuomo have been in possession of the following:

- The 2000 Arcadis Phase I, which revealed the use of "loose radioactive materials" at the Bethpage Facilities;

- Since 2013, Radium samples exceeding the MCL demonstrating that Radium was detected in the sole source aquifer in the Bethpage area, directly in line with groundwater flow from the Bethpage Facilities;

- Since 2013, knowledge that a Bethpage public drinking water supply well, which falls in line with groundwater flow from the Bethpage Facilities, was shut down due to Radium exceedances;

- Since 2013, Defendant Navy's radioactive materials records revealing the use of radioactive materials at the Bethpage Facilities;

- Since 2016, Grumman's 2016 Letter revealing the use of radioactive materials at the Bethpage Facilities and the two missing Alnor detectors each containing significant amounts of Radium;

- Since 2016, Radium samples exceeding the MCL in several wells throughout the Bethpage area directly in line with the groundwater flow direction.

192.   Upon information and belief, Defendant NYSDEC and Defendant Cuomo have been in possession of additional documents and information that evidence radioactive materials in the subsurface emanating from the Bethpage Facilities.

193.   Defendant NYSDEC has possessed the foregoing information while operating under Defendant Cuomo's oversight.

194.   Each of the foregoing facts constitutes "new information received" under § 27-1305(b) of the ECL and should have triggered Defendant NYSDEC's reassessment of its investigatory and remedial strategy.

195.   Defendant NYSDEC and Defendant Cuomo, however, failed to reassess in accordance with ECL § 27-1305(b).

196.   Defendant NYSDEC's and Defendant Cuomo's failure to properly assess and evaluate, while allowing the Plume to continue to spread, is grossly improper.

**ii.  Violations of NYSDEC Regulations and the National Contingency Plan**

197.   Defendant NYSDEC and Defendant Cuomo historically violated and continue to violate NYSDEC's own regulations, specifically, 6 N.Y.C.R.R. § 375-1.8(e) and (f).

198.   The Plaintiff has thoroughly examined Defendant's NYSDEC's and Defendant Cuomo's response to the detection of Radium in Bethpage's only source of drinking water and has eagerly waited for Defendant NYSDEC and Defendant Cuomo to take action in accordance with the law.

199.   To date, Defendant NYSDEC's and Defendant Cuomo's response actions and complete failure to address radioactivity in the subsurface in no way rises to the level that is required under the ECL and NYSDEC's own regulations.

200.  In fact, their lack of response has only exacerbated the imminent and substantial endangerment to health and the environment.

201.  Defendant NYSDEC, as lead agency, is obligated to comply with CERCLA and the National Contingency Plan ("NCP") pursuant to the regulations promulgated under the New York Inactive Hazardous Waste Disposal Site Remedial Program (6 N.Y.C.R.R. § 375-2.8(a)).

202.  Pursuant to the NCP, a remedial investigation ("RI") is first required to be conducted to assess site conditions.

203.  Pursuant to the NCP, upon completion of a new remedial investigation, a new feasibility study ("FS") must be conducted.

204.  The feasibility study must evaluate remedial alternatives by, among other things, considering remedial actions that enable MCLs established under the Safe Drinking Water Act to be attained.

205.  Pursuant to the NCP, a ROD must be issued whereby a remedial alternative is selected.

206.  Pursuant to the NCP, the selected remedial alternative must be implemented after entry of the ROD and site data and information make it possible to do so.

207.  Defendant Cuomo and Defendant NYSDEC have failed to formally investigate radioactive material in the Plume.

208.  Defendant Cuomo and Defendant NYSDEC have failed to conduct an adequate remedial investigation of the radioactive material contamination in the subsurface discussed above.

209.  Defendant Cuomo and Defendant NYSDEC have failed to conduct a proper FS as they have failed to consider radioactive material in the Plume.

210.  Defendant Cuomo and Defendant NYSDEC have failed to select an appropriate remedial alternative due to, among other things, their failure to investigate and consider radioactive material in the Plume.

211.  Defendant Cuomo and Defendant NYSDEC have failed to implement an appropriate remedial alternative due to, among other things, their failure to investigate and consider radioactive material in the Plume.

212.  Defendant Cuomo and Defendant NYSDEC have failed to comply with the NCP, CERCLA and 6 N.Y.C.R.R. § 375-2.8(a).

213.  It is critical that a suitable, effective and permanent remedial action be implemented in accordance with 40 C.F.R. § 300.430(f).

### iii. Selecting Wellhead Treatment as the Remedial Approach in 2001 was Grossly Improper and in Violation of NYSDEC Regulations

214.  Defendant NYSDEC issued RODs for each Operable Unit ("OU") of the Bethpage Superfund site.

215.  An OU is an administrative term used to identify a portion of a site that can be addressed by a distinct investigation and/or cleanup approach.

216.  The 2001 OU2 ROD addresses onsite and offsite groundwater contamination at, and flowing from, the Bethpage Facilities.

217.  By the 2001 OU2 ROD, Defendant NYSDEC selected a remedy focused on long term operation and maintenance of wellhead treatment systems (i.e. treating drinking water at the well) combined with long term groundwater monitoring (ie. not removing the pollutants from the subsurface).

218.  This 2001 OU2 ROD continues to be in effect today.

219.   There are several issues with Defendant NYSDEC's chosen remedial approach of wellhead treatment.

220.   Defendant NYSDEC selected wellhead treatment without conducting an investigation of radioactive material contamination.

221.   Consequently, the selected remedies, especially wellhead treatment, do not and could not possibly treat Radium effectively.

222.   The wellhead treatment systems were designed to treat drinking water contaminated with only the specific contaminants sampled for by Defendant NYSDEC at that time, which did not include radionuclides, including Radium and Radon.

223.   With recent sampling results confirming Radium in the sole source aquifer, the wellhead treatment systems currently in place are ineffective.

224.   This is demonstrated most notably by the fact that the local water district shut down public drinking supply well 4-1 in 2013 when Radium was detected in the well despite the operation of a wellhead treatment system on that well at that time.

225.   The wellhead treatment system in place at that well was not designed to treat Radium and could not successfully remove Radium from the drinking water.

226.   Defendant NYSDEC's decision to choose wellhead treatment as a remedial approach also violated Defendant NYSDEC's preferred source removal and control measures set forth in § 375-1.8(c) of NYSDEC's own regulations.

227.   According to § 375-1.8(c) of Defendant NYSDEC's regulations, Defendant NYSDEC is required to first remove and treat contamination to the greatest extent feasible, achieve containment to the greatest extent feasible, and eliminate exposure to the greatest extent feasible.

228. According to § 375-1.8(c) of Defendant NYSDEC's regulations, wellhead treatment is to "be considered a measure of last resort."

229. Further, 6 N.Y.C.R.R. § 375-1.8(a) requires that "[a]t a minimum, the remedy selected shall eliminate or mitigate all significant threats to the public health and to the environment presented by contaminants disposed at the site through the proper application of scientific and engineering principles."

230. Defendant NYSDEC's selection of wellhead treatment as a remedial approach did not comply with any of the foregoing requirements.

### c. Defendant NYSDEC's Implausible Denial of Existing Evidence Establishing the Prior Use of Radionuclides at the Bethpage Facilities

231. For decades Defendant NYSDEC had extensive knowledge of the history of operations at the Bethpage Facilities.

232. In October 2016, a member of Plaintiff sent an email to Defendant NYSDEC, inquiring, among other things, "what is being done to decontaminate and remove source or sources of radioactivity" at and emanating from the Bethpage Facilities.

233. In November 2016, the senior Director of Environmental Remediation at NYSDEC responded to that inquiry by stating, "we have found no information that radioactive materials (other than the sealed sources used in the Materials Laboratory and the instruments installed into aircraft) were used at the Grumman or Navy facilities."

234. This denial is significant as it establishes: (i) NYSDEC's knowledge that radioactive materials were used at the Bethpage Facilities, and (ii) NYSDEC's intent to misrepresent to the public their apparent knowledge that loose radioactive materials were used as the Bethpage Facilities.

32

235. Defendant NYSDEC denied knowledge of the use of "loose radioactive material" at the Bethpage Facilities when it was in possession of, among other things, the 2000 Arcadis Phase I, which revealed that "loose radioactive materials" were used at the Bethpage Facilities.

236. Notwithstanding Defendant NYSDEC's apparent knowledge that loose radioactive materials had been used at the Bethpage Facilities, Defendant NYSDEC has affirmatively denied such use and failed to conduct any formal investigation of radioactive materials.

        **d.**       **Defendant NYSDEC's Knowledge That a Plume of Radionuclide Contamination Exists**

237. Limited sampling of the Bethpage area by Defendant NYSDEC, Defendant Navy and Grumman has revealed at least seven (7) locations with Radium concentrations exceeding the MCL.

238. Limited sampling of the Bethpage High School and Central Boulevard Elementary School revealed nine (9) wells with Radium concentrations exceeding the MCL.

239. When studied in the aggregate, the results reveal Radium exceedances throughout the Bethpage area and reveal that a plume of radioactive material exists.

240. Nearly all of the Radium exceedances form a virtual straight line in a south-southeast direction from the Bethpage Facilities.

241. All of the Radium exceedances are within the confines of the Plume.

242. Groundwater flows in a south-southeast direction in the Bethpage area.

243. Despite being armed with the information from, among other sources, the 2000 Arcadis Phase I, the confirmed Radium exceedances in multiple wells, and Grumman's September 2016 Letter, Defendant NYSDEC neither notified the public nor promptly began a thorough and proper investigation of radionuclides in the subsurface.

244.   As of the date of this complaint, Defendants still have not performed a formal investigation.

245.   In fact, all of Defendant Cuomo's and Defendant NYSDEC's efforts to date have completely ignored the radioactive contamination.

246.   As stated above, these collective failures and unreasonable delays have violated the NCP, the ECL, and NYSDEC's own regulations.

   **e.    When Mandated by Law, Defendant NYSDEC Has Failed to Even Acknowledge the Radioactivity Contamination and Has Concealed Its Knowledge**

247.   After thirty (30) years of permitting the Plume to migrate and impact additional supply wells, Defendant NYSDEC was required to issue a report to the New York State Legislature describing how it would remediate *all* contaminants in the Plume by removal of contaminants from the subsurface.

248.   In 2014, Bill S07832/A09492 was signed into law (the "2014 Law") requiring Defendant NYSDEC to issue a report to the New York State Legislature outlining a plan to hydraulically contain and remediate the Plume.

249.   The 2014 Law was passed in the New York State Assembly unanimously and passed in the New York State Senate 58 to 1.

250.   The 2014 Law states as follows,

> Section 1. The New York state department of environmental conservation shall create and deliver to the state legislature a report detailing the options of intercepting and remediating a groundwater plume of contaminants, including but not limited to PCE and TCE, emanating from the former Naval Weapons Industrial Plant operated by the United States Navy and the Grumman Aircraft Engineering Corporation facilities in Bethpage, town of Oyster Bay, county of Nassau.

Section 2. This report must focus on the utilization of hydraulic containment and state of the art remediation practices to remove these contaminants without utilizing well head treatment, which is a measure of last resort only. It must focus on how to accomplish this goal in a timely manner so as to stop the migration of the Navy Grumman plume before it reaches the public water supply wells of the Massapequa water district and the South Farmingdale water district as well as the New York American Water Corporation wells. It must be designed to also protect the natural resources, specifically the fresh water bodies, tributaries, wetlands and the salt water natural resources of the Great South Bay from these contaminants.

Section 3. This report shall estimate the cost, scope, and timetable of such a project and how the department of environmental conservation would, along with enlisting the assistance of the New York State department of Law and the United States Department of Justice, enforce the law and cause the United States Navy to pay for or reimburse the costs associated with this project.

Section 4. This act shall take effect immediately.

251.  The New York State Legislature's intent with respect to the 2014 Law is revealed in the legislative findings, which provide, in pertinent part, as follows:

All scientific and engineering studies conducted in this region prove that a growing and migrating plume of contaminants have been traveling through the aquifer system in this region of Long Island. While the concentrations of these contaminants raise questions as to the level of danger they present, it is clear that the most prudent approach is to remove all contaminants possible.  This legislation sets out to create a comprehensive report designed to stop the plume's migration, remove the contaminants, and protect the public drinking water supply wells, and the natural resources including the fresh water wetlands and salt water environment from dangerous chemicals and contaminants.

252.  In July 2016, Defendant NYSDEC submitted the report to the New York State Legislature in response to the 2014 Law (the "2016 NYSDEC Report").

253.  A review of the 2016 NYSDEC Report reveals that Defendant NYSDEC failed to comply with virtually every requirement of the 2014 Law.

### i. Defendant NYSDEC's Failure to Even Mention Radioactive Materials or Radium in the 2016 NYSDEC Report

254.  The 2014 Law required Defendant NYSDEC's report to detail the alternatives of remediating all contaminants in the Plume.

255.  At the time Defendant NYSDEC released the 2016 NYSDEC Report, Defendant NYSDEC was in possession of, among other documents and information, the 2000 Arcadis Phase I, and was aware of Radium exceedances in multiple wells.

256.  Defendant NYSDEC failed to comply with the 2014 Law as the 2016 NYSDEC Report does not mention Radium or any other radioactive material in any context.

257.  The remedial options discussed in the 2016 NYSDEC Report are simply ineffective as all of the known contaminants, including radioactive materials, were not evaluated.

### ii. Defendant NYSDEC's Failure to Consider Remediation as Required by the 2014 Law

258.  The 2014 Law required Defendant NYSDEC to address "state of the art remediation practices to remove the contaminants without using well head treatment" to timely address the areas of the Plume that are already impacted.

259.  The 2016 NYSDEC Report focuses on hydraulic containment of the Plume to prevent further migration and future impacts to Massapequa's water supply.

260.  The 2016 NYSDEC Report does not address the direct remediation of any areas already impacted by the Plume.

261.  Accordingly, Defendant NYSDEC failed to comply with this requirement of the 2014 Law.

### iii. Defendant NYSDEC's Failure to Consider Timely Remediation

262.  The 2014 Law required Defendant NYSDEC to "focus on how to accomplish [remediation] in a timely manner."

263.  According to the 2016 NYSDEC Report, the remedial alternatives considered by Defendant NYSDEC would require operation for over 200 years.

264. Defendant NYSDEC discussed these alternatives knowing that radioactive materials will likely remain in the groundwater and soil vapor during the 200 year remediation process potentially leaving citizens and their future generations exposed for over two (2) centuries.

### iv. Defendant NYSDEC's Failure to Select a Remedial Alternative That Protects the Environment

265.  The 2014 Law requires Defendant NYSDEC to consider remedial options "designed to also protect natural resources, specifically the freshwater bodies, tributaries, wetlands and salt water natural resources of the Great South Bay from these contaminants."

266.  Yet, the remedial alternatives discussed by Defendant NYSDEC in the 2016 NYSDEC report require: (i) the pumping of 730 billion gallons of groundwater from the sole source aquifer that supplies the three (3) million residents of Long Island, and (ii) after treating the pumped groundwater for investigated contaminants, depositing the 730 billion gallons of groundwater into a nearby Massapequa tributary or recharge basins.

267.  Remarkably, Defendant NYSDEC failed to consider that the groundwater may be contaminated with radioactive material and pumping it into a neighboring surface water body or recharge basin without treating the radioactivity could exponentially increase the risk of exposure to radioactivity to both humans and wildlife.

### v. Defendant NYSDEC's Failure to Address Obtaining Financial Assurance From Defendant Navy

268.   The 2014 Law requires Defendant NYSDEC to consider how to cause Defendant Navy "to pay for or reimburse the costs associated with this project."

269.   The 2016 NYSDEC Report does not address how to cause Defendant Navy to pay for or reimburse the costs associated with remediation or otherwise discuss how the remediation would be funded.

### f.   Defendant NYSDEC's 2017 Engineering Investigation

270.   On August 10 2017, Defendant NYSDEC issued a press release announcing "drilling operations underway to assess containment options for U.S. Navy/Northrop Grumman Containment Plume."

271.   The press release, however, fails to make a single mention of Radium or radioactivity.

272.    Further, the press release reveals Defendant NYSDEC is solely investigating the *engineering design* of how to contain the Plume in accordance with the 2016 NYSDEC Report.

273.   The press release evidences that Defendant NYSDEC is not conducting an investigation of contaminants in the Plume, including Radium, to consider remedial alternatives.

274.   As recent as August 2017, Defendant NYSDEC has continued its failure to develop a plan to adequately investigate radioactive material in the Plume.

275.   Defendant NYSDEC has failed to fulfill its obligations as the lead agency making intervention from the public necessary to ensure that the contamination is fully investigated and remediated without further delay.

g.   **Defendant Cuomo's Failure to Acknowledge the Radium Contamination During a December 2017 Announcement Regarding a Groundwater Plume Containment Plan**

276.   On December 21, 2017, Defendant Cuomo held a press event where he announced the State's plan to proceed with containment and remediation of the Plume.

277.   Defendant Cuomo addressed the contaminants of concern found within the Plume, and specifically listed twenty-four (24) contaminants, including "some not previously mapped like 1,4,-dioxane…"

278.   Neither Radium nor any other radioactive materials were included on the list of twenty-four (24) contaminants of concern.

279.   Neither Radium nor any other radioactive materials were disclosed as a contaminant "not previously mapped."

280.   Defendant Cuomo did not mention the presence of Radium in any context, despite the fact that Radium has exceeded the MCL in over fifteen (15) locations in the Bethpage area and despite receiving Plaintiff's September 8th notice letter discussing the same.

281.   Accordingly, as recent as December 21, 2017 and after their receipt of Plaintiff's notice letter, Defendants Cuomo and NYSDEC have continued to ignore the radioactive material in the subsurface.

282.   Defendants Cuomo and NYSDEC have evidenced their unwillingness to investigate and remediate radioactive materials in the Plume rendering it necessary for a third party, such as Plaintiff, to cure their failures.

### E.  Defendant Navy's Failures

283.  Based on the fact that Defendant Navy operated a portion of the Bethpage Facilities for seventy (70) years, Defendant Navy has known that radioactive material was used at the Bethpage Facilities and may be present in the groundwater Plume emanating therefrom.

284.  Notwithstanding this, Defendant Navy has ignored its obligations under CERCLA to, among other things, conduct an adequate investigation of the Plume.

### a.      Defendant Navy's Knowledge of Radioactive Material Use at Bethpage

285.  Defendant Navy's operations at the Bethpage Facilities commenced in the 1940's.

286.   Because Defendant Navy operated at the Bethpage Facilities for approximately seventy (70) years, Defendant Navy presumably had knowledge of operations and materials used.

287.  Further, according to a November 1997 letter from Grumman to Defendant Navy, Grumman advised the Navy by letter that, "under New York State regulations pertaining to licensees of radioactive materials, that they [Grumman] were required to maintain inventory records of all licensable quantities of radioactive materials used on Northrop Grumman properties."

288.  Based on the documents in the Plaintiff's possession, Defendant Navy unquestionably had knowledge of radioactive material use for at least twenty (20) years.

### b.      Defendant Navy's Failure to Address the Presence of Radioactive Materials in the Groundwater

289.  In mid-June 2017, Defendant Navy submitted a groundwater report to the United States Congress pursuant to the Water Infrastructure Improvements for the Nation Act of 2016 (the " WIIN Act").

290.  The WIIN Act required Defendant Navy to provide a description of the status of the groundwater contaminants that are emanating from the Bethpage Facilities and migrating to a location within a 10-mile radius of the Bethpage Facilities.

291.  Prior to submitting the report, Defendant Navy had knowledge of elevated levels of Radium in the groundwater and had provided sampling results to Defendant NYSDEC and Plaintiff identifying several wells in the vicinity with Radium levels exceeding the MCL of 5 pCi/L.

292.  The final report submitted to Congress, however, did not mention Radium or radioactive materials in any context.

293.  Defendant Navy has neglected to address the radioactive materials contamination and its potential severity.

294.  As stated *supra*, Defendant Navy provided its records revealing the use of radioactive materials at the Bethpage Facilities to Defendant NYSDEC in 2013.

295.  Defendant Navy had copies of those records in its possession when submitting its 2017 report to Congress.

296.  Defendant Navy has failed to explain why this information was not included in the report submitted by Defendant Navy to Congress in June 2017.

c.      **Defendant Navy's Radioactive Records Review**

297.  After learning of the detection of radioactive materials in the subsurface, United States Senator Charles Schumer demanded that all documents regarding use, storage and disposal of Radium and related radioactive materials at Bethpage Facilities be made publicly available.

298.  On June 27, 2017, Defendant Navy responded to the Senator's request by stating that "Northrop Grumman conducted the day-to-day operations at NWIRP Bethpage, so our [the Navy's] historical records, especially radiological records, are limited."

299.  Defendant Navy also advised that it already provided all records regarding the use of radioactive materials at the Bethpage Facilities to Defendant NYSDEC in 2013.

300.  Those records were finally made public once Senator Schumer made his demand in 2017.

301.  Plaintiff reviewed those records and was astounded to learn the earliest record produced by Defendant Navy was from 2003, leaving approximately seventy (70) years of undocumented Navy operations.

302.  Plaintiff questions whether Defendant Navy is in possession of additional documents due to this seventy (70) year document gap, as well as, information contained in one of the produced records - the Navy's 2003 Environmental Baseline Survey ("2003 EBS") of the NWIRP facility.

303.  The 2003 EBS reveals Defendant Navy conducted a "thorough search of Northrop Grumman's records as well as interviews of current Northrop Grumman employees."

304.  Presumably, Defendant Navy is in possession of these records and/or information described in these records, after conducting such review.

> **d.    Defendant Navy's Obligation and Failure to Comply with CERCLA and its Regulations**

305.  Upon information and belief, Defendant Navy has known that radioactive materials were used at the Bethpage Facilities for decades.

306.  Despite this apparent knowledge, Defendant Navy has failed to adequately investigate and remediate the radioactive material that exists in the subsurface.

307.   This failure has resulted in the migration of radionuclide contamination through the subsurface at, and adjacent to, the Bethpage Facilities and contamination of the groundwater, the only source of drinking water in the area.

308.   Defendant Navy's failures have led to an imminent and substantial endangerment to the public and the environment that should have been investigated and prevented decades ago.

### i.   Defendant Navy's Obligation to Comply with CERCLA and the NCP

309.   NWIRP is a Federal Facility listed on the most recent version of the Federal Agency Hazardous Waste Compliance Docket published on March 3, 2016.

310.   NWIRP has been listed on the Federal Agency Hazardous Waste Compliance Docket since the initial docket was published on February 12, 1988.

311.   NWIRP is listed on the Federal Agency Hazardous Waste Compliance Docket under the reporting mechanism of Section 3016 of RCRA, which requires federal facilities to submit an inventory of hazardous waste sites they own or operate, or have owned and operated in the past (biennial inventory of hazardous waste activities).

312.   Under 42 U.S.C. § 9620(a)(1) and (2), Defendant Navy, as an agency of the United States and owner of NWIRP, a Federal Facility listed on the Federal Agency Hazardous Waste Compliance Docket, is required to comply with CERCLA and its regulations, including the NCP.

### ii.   Defendant Navy's Violations of CERCLA and the NCP

313.   Defendant Navy's violations of CERCLA and the NCP are gross and numerous.

### 1.  Defendant Navy's Violation of the NCP

314.  Pursuant to the NCP, a RI and FS are required to be conducted prior to the issuance of a ROD to assess site conditions and evaluate remedial alternatives to facilitate the selection of the appropriate remedial actions to be implemented.  See ¶¶ 201-206 *supra*.

315.  Notwithstanding this, Defendant Navy has failed to conduct any formal remedial investigation of radioactive material contamination within the Plume.

316.  After the remedial investigation is complete, a feasibility study must consider remedial alternatives that enable the MCL established under the Safe Drinking Water Act to be attained in accordance with 40 C.F.R. § 300.430(e).

317.  Defendant Navy's feasibility study conducted prior to its issuance of the offsite ROD failed to consider MCLs for Radium or any radioactive material.

318.  The feasibility study relied on by Defendant Navy prior to issuing the offsite ROD did not analyze remedial alternatives that could remediate radioactive material in the Plume.

319.  Defendant Navy published three (3) RODs during the period of 1995 to 2015 in relation to remediation of the Bethpage Facilities.

320.  None of the three (3) RODs issued by Defendant Navy mention radioactive materials or the use, treatment, investigation or remediation thereof.

321.  Defendant Navy issued a ROD for offsite remediation of the Plume that mirrors the 2001 OU2 ROD issued by Defendant NYSDEC.

322.  The applicable ROD issued by Defendant Navy selects wellhead treatment as the primary remedial approach like the 2001 OU2 ROD issued by Defendant NYSDEC.

323. Since an adequate investigation has not been performed, the selected remedial approach of wellhead treatment creates an illusion that residents are protected, when in reality the wellhead treatment systems in place cannot effectively treat Radium.

324. Defendant Navy's failures to adequately investigate the Plume for radioactive material prior to conducting a feasibility study and issuing a ROD is a gross violation of the NCP and CERCLA.

## 2.  Defendant Navy's Violation of Section 9620(a)(4) of CERCLA

325. Pursuant to 42 U.S.C. § 9620(a)(4) of CERCLA, Defendant Navy is obligated to comply with the laws of New York State concerning removal and remedial actions.

326. Regulation 375-1.8(e)(1) and (2) promulgated by Defendant NYSDEC (6 N.Y.C.R.R. § 375-1.8(e)(1) and (2)) requires remedial investigations to, *inter alia*, fully delineate all contaminants emanating from a site, identify sources of contamination, evaluate actual and potential threats to public health and the environment, and produce data sufficient to support the necessity for remediation and the evaluation of remedial alternatives.

327. Regulation 375-1.8(f) promulgated by Defendant NYSDEC (6 N.Y.C.R.R. § 375-1.8(f)) requires a remedy to be selected upon consideration of nine (9) factors including: (i) overall protectiveness of public health and the environment, (ii) conformance to applicable standards and criteria (i.e. will contaminants ultimately be remediated to levels below their respective MCLs), (iii) long term effectiveness, (iv) reduction in toxicity, and (v) short term impacts.

328. As Defendant Navy failed to conduct a remedial investigation for Radium or radioactive material or otherwise mention Radium or radioactive material in the applicable ROD,

Defendant Navy is in violation of the cited regulations and, therefore, is in violation of section 9620(a)(4) of CERCLA.

### 3. Defendant Navy's Violation of Section 9621(b)(1) of CERCLA

329. Pursuant to 42 U.S.C. § 9621(b)(1) of CERCLA, Defendant Navy is obligated to conduct an assessment of permanent solutions and alternative treatment technologies that will result in a permanent and significant decrease in the toxicity, mobility or volume of the hazardous substance at a particular site.

330. In assessing alternative remedial actions, section 9621(b)(1) of CERCLA requires Defendant Navy to take into account the persistence, toxicity, mobility, and propensity to bioaccumulate of such hazardous substances and their constituents, the short and long term potential for adverse health effects from human exposure, the potential for future remedial action costs if the alternative remedial action were to fail, and the potential threat to human health and the environment associated with excavation, transportation, redisposal or containment.

331. Section 9621(b)(1) requires that the selected remedial action be protective of human health and the environment, cost effective, and utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent possible.

332. Section 9621(b)(1) specifically states that remedial actions that reduce volume, toxicity and mobility of hazardous substances are preferred over ones that do not.

333. Defendant Navy chose wellhead treatment as the primary remedial action to address the contaminants emanating from the Bethpage Facilities.

334. A wellhead treatment system is a temporary solution to protect the citizens of Bethpage from exposure to contaminated drinking water, but fails to address the persistence, toxicity and mobility of the pollutants in the Plume.

335.   As a result of Defendant Navy's selection of wellhead treatment the Plume has spread to an area of nearly six (6) square miles.

336.   As discussed *supra*, the wellhead treatment systems installed are not equipped to treat Radium and therefore, have not and do not protect citizens from exposure to such materials.

337.   As a result of Defendant Navy's selection of wellhead treatment, the citizens of Bethpage are at risk of exposure to radioactive materials from their only public drinking water supply.

338.   If a selected remedial action does not comply with section 9621(b)(1), section 9621(d)(4) of CERCLA requires the selecting party to publish an explanation as to why a compliant remedial action was not selected.

339.   Defendant Navy failed to publish an explanation as to why it selected wellhead treatment and has failed to address the radioactive materials in the subsurface.

340.   Defendant Navy is in violation of section 9621(b)(1) and (d)(4) of CERCLA.

### 4.   Defendant Navy's Violation of Section 9621(c) of CERCLA

341.   Pursuant to Section 9621(c) of CERCLA, Defendant Navy is obligated to conduct a review of the selected remedial action no less often than each five (5) years after the initiation of such remedial action to assure that human health and the environment are being protected by the remedial action being implemented.

342.   Defendant Navy published a 2013 Five-Year Review of OU 1 and OU 2 in December 2014 (the "Five-Year Review Report").

343.   By the time the Five-Year Review Report was published, Defendant Navy had knowledge that a public drinking water supply well had been shut down due to the detection of elevated levels of Radium.

344. By the time the Five-Year Review Report was published, Defendant NYSDEC had already required Defendant Navy to produce all records pertaining to the use and disposal of radioactive materials at the Bethpage Facilities.

345. Yet, Defendant Navy's Five-Year Review Report does not mention Radium or radioactive materials in any context.

346. Additionally, the Five-Year Review Report does not address the shutdown of public drinking supply well 4-1 and the ineffectiveness of the wellhead treatment system installed on that well.

347. Defendant Navy's failure to address the ineffectiveness of its selected remedial action and its lack of protection of human health and the environment in the Five-Year Review Report is in violation of section 9621(c) of CERCLA.

## 5. Defendant Navy's Violation of Section 9621(d)(1) of CERCLA

348. Pursuant to Section 9621(d)(1) of CERCLA, remedial actions shall attain a degree of cleanup of hazardous substances released into the environment and control further releases at a minimum which assures protection of human health and the environment.

349. Pursuant to Section 9621(d)(1) of CERCLA, remedial actions shall be relevant and appropriate under the circumstances presented by the release or threatened release of such substance, pollutant, or contaminant.

350. As discussed *supra*, Defendant Navy failed to select a remedial action that remediates and contains the existing radioactive materials in the subsurface.

351. Defendant Navy has failed to assure the protection of human health and the environment in violation of section 9621(d)(1) of CERCLA.

### F.  Plaintiff Must Be Authorized to Conduct an Investigation and Remediation

352.  The Radium and Radon sampling results referenced *supra* were obtained by independent parties using different protocols.

353.  It is necessary for one party to do a comprehensive investigation of radioactive material in the Plume to ensure the consistency of protocols and sampling measures.

354.  NCP section 40 C.F.R.§ 300.430(c)(2)(A) provides that Defendant NYSDEC and Defendant Navy must "[e]nsure the public appropriate opportunities for involvement in a wide variety of site related decisions, including site analysis and characterization, alternative analysis and selection of remedy."

355.  For thirty (30) years, Defendants have failed to formally investigate and remediate the radioactivity in the Plume.

356.  Defendants cannot be relied upon to properly investigate and remediate radioactivity within the Plume.

357.  Plaintiff, which will be advised by Plaintiff's Experts, must be authorized to conduct a comprehensive formal investigation and complete remediation of radioactivity in the Plume to ensure public protection and remedy Defendants' ongoing failures.

**FIRST CLAIM FOR RELIEF**
**AGAINST ALL DEFENDANTS**
**RCRA Suit Pursuant to 42 U.S.C. § 6972(a)(1)(B)**

358.  Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

359.  Pursuant to 42 U.S.C. § 6972(a)(1)(B)-

> [A]ny person may commence a civil action on his own
> behalf . . . against any person, including the United States
> and any other governmental instrumentality or agency, to
> the extent permitted by the eleventh amendment to the
> Constitution, and including any past or present generator,

49

> past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

360. Pursuant to 42 U.S.C. § 6903(15), Plaintiff is a "person" as referenced in 42 U.S.C. § 6972(a)(1)(B).

361. Pursuant to 42 U.S.C. §§ 6903(15) and 6972(a)(1)(B), Defendants are "persons" as referenced in 42 U.S.C. § 6972(a)(1)(B).

362. Pursuant to 42 U.S.C. § 6903(5), Radium, Radon, and other radioactive material are hazardous wastes.

363. Defendants have contributed and/or are contributing to the handling and/or treatment of hazardous wastes in the subsurface at and emanating from the Bethpage Facilities.

364. Defendants' failures to handle and/or treat radioactive materials, including Radium and Radon, in the subsurface at and emanating from the Bethpage Facilities has presented an imminent and substantial endangerment to the health of the citizens of Bethpage and their future generations and/or the environment.

365. By reason of the foregoing Plaintiff is entitled to the relief requested *infra*.

## SECOND CLAIM FOR RELIEF
### AGAINST DEFENDANTS UNITED STATES OF AMERICA AND THE UNITED STATES NAVY
### CERCLA Suit Pursuant to 42 U.S.C. § 9659(a)(1)

366. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

367. Pursuant to 42 U.S.C. § 9659(a)(1)-

[A]ny person may commence a civil action on his own behalf--

> (1) against any person (including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter (including any provision of an agreement under section 9620 of this title, relating to Federal facilities).

42 U.S.C. § 9659(a)(1).

368. Pursuant to 42 U.S.C. § 9601(21), Plaintiff is a "person" as referenced in 42 U.S.C. § 9659(a)(1).

369. Pursuant to 42 U.S.C. §§ 9601(21) and 9659(a)(1), Defendant Navy is a "person" as referenced in 42 U.S.C. § 9659(a)(1).

370. Defendant Navy is required to comply with CERCLA pursuant to 42 U.S.C. § 9620(a)(1), "[e]ach department, agency, and instrumentality of the United States . . . shall be subject to, and comply with, [CERCLA] in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title."

371. Further, pursuant to 42 U.S.C. § 9620(a)(2)-

> [A]ll guidelines, rules, regulations, and criteria which are applicable to preliminary assessments carried out under [CERCLA] for facilities at which hazardous substances are located, applicable to evaluations of such facilities under the National Contingency Plan, applicable to inclusion on the National Priorities List, or applicable to remedial actions at such facilities shall also be applicable to facilities which are owned or operated by a department, agency, or instrumentality of the United States in the same manner and to the extent as such guidelines, rules, regulations, and criteria are applicable to other facilities. No department, agency, or instrumentality of the United States may adopt or utilize any such guidelines, rules, regulations, or criteria which are inconsistent with the guidelines, rules,

regulations, and criteria established by the Administrator under [CERCLA].

42 U.S.C. § 9620(a)(2).

372.   Additionally, pursuant to section 9620(a)(4) of CERCLA, Defendant Navy is required to comply with applicable state laws regarding removal and remedial action, including state laws regarding enforcement.

373.   Accordingly, Defendant Navy, as an agency of the United States and owner of NWIRP, a Federal Facility listed on the Federal Agency Hazardous Waste Compliance Docket, is required to comply with CERCLA and its implementing regulations, including those set forth in the NCP.

374.   Defendant Navy's violations of CERCLA and the NCP are gross and numerous.

375.   Defendant Navy's violations of CERCLA and the NCP include, but are not limited to, those discussed in section E.d. *supra*.

376.   By reason of the foregoing Plaintiff is entitled to the relief requested *infra*.

### THIRD CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS
#### Injunctive Relief

377.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

378.   Plaintiff will suffer irreparable injury if Defendants are permitted to continue the violations discussed herein.

379.   Plaintiff is likely to prevail on the merits of its claims against the Defendants based upon the allegations set forth herein and the facts of this case.

380.   The balance of hardships weighs decidedly in favor of the granting of injunctive relief.

381.  Consequently, Plaintiff seeks a permanent injunction preventing Defendants from continuing the current violations and for the relief set forth *infra*.

382.  The requested injunctive relief is a necessary step to remedy Defendants' failures.

383.  By reason of the foregoing, Plaintiff is entitled to the relief requested *infra*.

[*Remainder of page intentionally left blank*]

**WHEREFORE,** Plaintiff demands judgment on its claims for relief in its favor and against Defendants as follows:

a.   Ordering an immediate and complete investigation and delineation of the contamination of radioactive materials in the subsurface and indoor air emanating from the Bethpage Facilities for the purpose of enabling a comprehensive evaluation of the nature and extent of underlying contamination, to be performed by Plaintiff (with Defendant NYSDEC's oversight);

b.   Ordering, through a formal feasibility study to be performed by Plaintiff (with Defendant NYSDEC's oversight), the development of a more effective remediation strategy designed to eliminate or significantly reduce the current threat of radioactive material contamination to the environment and human health;

c.   Ordering Defendant NYSDEC to select an adequate and proper remedial alternative with substantial participation of the Plaintiff;

d.   Ordering Defendant NYSDEC to issue a remedial decision or Record of Decision with substantial participation of the Plaintiff;

e.   Ordering the timely implementation of the necessary remedial actions based on the feasibility study and the remedial decision;

f.   Directing Defendant Navy to fund the costs associated with above items a through e.

g.   Appointing Rigano LLC (undersigned counsel) as Master Coordinator to provide direction to contractors, consultants, water districts, citizens and government agencies to implement the investigatory and remedial work requested herein and oversee the Court's remedy.

h.   Ordering Rigano LLC, as master coordinator, to operate under Defendant NYSDEC oversight, with a Court of proper jurisdiction to hear and settle disputes.

i.   Ordering that the Master Coordinator will be compensated at 5% of proceeds disbursed in accordance with its duties;

j.   Awarding Plaintiff the costs of litigation, including legal fees, expert witness fees and associated litigation costs, in an amount to be determined at trial, pursuant to 42 U.S.C. § 9659(f) and/or 42 U.S.C. § 6972(e).

k.   Any other relief that the Court deems just and proper.


Dated: February 1, 2018
        Melville, New York

RIGANO LLC
*Counsel to Plaintiff Long Island Pure Water Ltd.*

By:      *s/ James P. Rigano*_____
         James P. Rigano, Esq.
         Nicholas C. Rigano, Esq.
         Alyse Delle Fave, Esq.
         538 Broad Hollow Road, Suite 217
         Melville, New York 11747
         Telephone: (631) 756-5900