UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
LONG ISLAND PURE WATER LTD.,

                        Plaintiff,                    **MEMORANDUM AND ORDER**
                                                                 2:18-cv-727 (DRH)(ARL)

    - against -

GOVERNOR ANDREW M. CUOMO, STATE OF
NEW YORK, N.Y. STATE DEP'T OF ENVTL.
CONSERVATION, UNITED STATES OF
AMERICA, UNITED STATES DEP'T OF THE
NAVY, BASIL SEGGOS, in his official capacity as
Commissioner of the N.Y. State Dep't of Envtl.
Conservation, MARTIN BRAND, in his official
capacity as Deputy Commissioner of the N.Y. State
Dep't of Envtl. Conservation, and CARRIE MEEK
GALLAGHER, in her official capacity as Regional
Director for Region 1 of the N.Y. State Dep't of
Envtl. Conservation,

                        Defendants.
------------------------------------------------------X

**APPEARANCES**

**RIGANO LLC**
Attorneys for Plaintiff
538 Broad Hollow Rd., Suite 217
Melville, NY 11747
  By:    Nicholas Charles Rigano, Esq.
           James P. Rigano, Esq.

**NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL**
Attorneys for State Defendants
28 Liberty Street
New York, NY 10005
  By:    Andrew G. Frank, Esq.
           Norman Spiegel, Esq.

**U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF N.Y.**
Attorney for Federal Defendants
610 Federal Plaza
Central Islip, NY 11722
By:     Robert W. Schumacher, II

**HURLEY, Senior District Judge:**

## INTRODUCTION

Plaintiff Long Island Pure Water Ltd. ("Plaintiff") brought this action seeking injunctive relief and damages for violations of the Resource Conservation and Recovery Act ("RCRA") and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERLA") against Defendants Governor Andrew M. Cuomo, the State of New York, the New York State Department of Environmental Conservation ("NYSDEC"), Basil Seggos in his official capacity as Commissioner of the New York State Department of Environmental Conservation, Martin Brand in his official capacity as Deputy Commissioner of the N.Y. State Department of Environmental Conservation, and Carrie Meek Gallagher, in her official capacity as Regional Director for Region 1 of the N.Y. State Department of Environmental Conservation (all together the "State Defendants"), and the United States of America and the United States Department of the Navy ("Navy," together with the United States of America, "Federal Defendants," and together with the State Defendants, "Defendants").

Presently before the Court are the State Defendants' motion to dismiss pursuant to Fed. R. Civ. P ("Rule") 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim, as well as the Federal Defendants' motion to dismiss pursuant Rule 12(b)(1).  For the reasons explained below, both the State Defendants' and the Federal Defendants' motions are granted and the matter is dismissed.

## BACKGROUND

The following relevant facts are taken from the Amended Complaint ("Am. Compl.") and are assumed true for purposes of this decision.

This action concerns activities that commenced in the early 1940's on approximately 605 acres in Bethpage, New York (the "Bethpage Facilities"). (Am. Compl. ¶ 35.) The Navy operated the Naval Weapons Industrial Reserve Plant ("NWIRP") on 105 of the 605 acres. (*Id.* ¶ 36.) The NWIRP was government-owned and occupied, but contractor-operated. (*Id.*) The remaining 500 acres were owned by Northup Grumman, formerly Grumman Aerospace Corporation and Grumman Aircraft Engineering Corporation ("Grumman"). (*Id.* ¶ 37.) Operations at the Bethpage Facilities included, "among other things, research, prototyping, testing, design engineering, fabrication, and primary assembly of military aircraft." (*Id.* ¶ 38.)

During many decades of operations at the Bethpage Facilities, Grumman and Defendant Navy "used, spilled, and/or otherwise discarded hazardous materials into the surrounding soils." (*Id.* ¶ 39.) Apparently, these hazardous materials eventually reached the groundwater, which spread the pollutants over a wide area creating a "Plume." (*Id.* ¶ 43.) Defendants do not dispute the existence of the Plume, or that it contains perchloroethene (tetrachloroethylene), trichloroethene, dichloroethenes, vinyl chloride, 1,1,1 trichloroethane. (*Id.* ¶ 45.) "Several public drinking water supply wells are known to be threatened by the Plume." (*Id.* ¶ 53.)

In 1983, the NYSDEC listed the Bethpage Facilities as a New York State Inactive Hazardous Waste Site. (*Id.* ¶ 46.) In 1993, the NYSDEC divided the Bethpage Facilities into the Grumman site and the 105-acre Navy NWIRP site. (*Id.* ¶ 47.) The Bethpage Facilities are currently listed as Class 2 Inactive Hazardous Waste Sites, meaning "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or

breakdown products represents a significant threat to public health or the environment." (*Id.* ¶ 48.)

Radium is a radioactive metal that exists in thirty four isotopes and is a hazardous waste when disposed. The maximum contaminant level ("MCL"), which is the legal threshold limit, for Radium-226 and Radium-228 is five picocuries per liter ("pCi/L"). (*Id.* ¶¶ 62–65.) Quantities exceeding this MCL in the drinking water supply are hazardous to human health and the environment. (*Id.*) Radium has not been found to exceed the MCL naturally on Long Island. (*Id.* ¶ 67.) Apparently, Defendants have never released sampling results for Radium-226 or Radium-228 from the Plume. (*Id.* ¶ 77.)

The Bethpage local water district's public drinking water supply well 4-1 is located southeast of the Bethpage Facilities and in the direction of the groundwater flow. (*Id.* ¶ 69.) On August 4, 2012, the local water district detected Radium in well 4-1 at 4.72 pCi/L, just below the MCL of 5 pCi/L. (*Id.* ¶ 71.) In or around May 2013, the local water district shut down well 4-1 from service due to the detection of elevated Radium that was continuing to rise. (*Id.* ¶ 74.) On December 7, 2015, Radium was detected at well 4-1 at 5.92 pCi/L and 5.21 pCi/L. (*Id.* ¶ 76.)

In June 2017, the Bethpage School District released sampling results from three groundwater monitoring wells at Bethpage High School showing Radium detected at levels ranging from 10.46 pCi/L to 24.74 pCi/L. (*Id.* ¶ 82.) In August 2017, the Bethpage School District released sampling results from three groundwater monitoring wells at the High School showing Radium detected at levels ranging from 9.63 pCi/L to 23.95 pCi/L. (*Id.* ¶ 83.) Also in August, the Bethpage School District released sampling results from three groundwater monitoring wells at Central Boulevard Elementary School showing Radium detected at levels ranging from 12.19 pCi/L to 32.18 pCi/L. (*Id.* ¶ 84.) Plaintiff alleges that there are at least

twelve additional samples taken in the Bethpage area from 2013 to 2016 detecting Radium levels ranging from 5.23 pCi/L to 8.59 pCi/L.  (*Id.* ¶ 85.)

In addition to contaminating groundwater, Radium-226 decays to the radioactive gas Radon-222, which is a known carcinogen that "can move upwardly through soil and may impact indoor air quality[.]"  (*Id.* ¶¶ 90, 91.)  Radon generally occurs on Long Island at levels below 2.0 pCi/L.  (*Id.* ¶ 99.)  The recommended indoor air action level for Radon is 4.0 pCi/L.  (*Id.* ¶ 100.)  The Bethpage School District conducted isolated Radon sampling at the Bethpage High School and the Central Boulevard Elementary School, which revealed Radon levels of 3.8 pCi/L and 3.9 pCi/L, just below the threshold of 4.0 pCi/L.  (*Id.* ¶ 103.)  Plaintiff does not make any comment on the risks of Radon at level of 3.9 pCi/L, if any, but anything at or above 4.0 pCi/L would be a danger to human health and the environment.  (*See id.*)  "Defendants have failed to formally investigate Radon contamination in the Bethpage area."  (*Id.* ¶ 112.)  Plaintiff also contends that the State Defendants contributed to the endangerment of the public and the environment by failing to take action required by law.  (*See, e.g.*, *id.* ¶¶ 250–253.)

Plaintiff brought the instant action on February 1, 2018, and filed the Amended Complaint on April 12, 2018.  The Amended Complaint sets forth three causes of action.  The first claim is brought against all Defendants for violations of RCRA.  (*Id.* ¶¶ 420 – 428.)  The second claim is brought against the Federal Defendants for violations of CERCLA.  (*Id.* ¶¶ 429–439.)  The third claim is brought against all Defendants for injunctive relief "preventing Defendants from continuing the current violations" and seeking for Plaintiff's counsel to be appointed to oversee the cleanup efforts and to receive a commission equal to five percent (5%) of the total funds allocated for the Bethpage Facilities.  (*See id.* ¶¶ 440–446.)

## DISCUSSION

I. *The State Defendants' Motion to Dismiss*

    a. Rule 12(b)(1) Legal Standard

"A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000). "In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 136 (E.D.N.Y. 2006) (quoting *Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 286 (S.D.N.Y. 2006)), *aff'd*, 273 F. App'x 61 (2d Cir. 2008); *accord Tomaino v. United States*, 2010 WL 1005896, at *1 (E.D.N.Y. Mar. 16, 2010). "In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional questions." *Cunningham v. Bank of New York Mellon, N.A.*, 2015 WL 4101839, * 1 (E.D.N.Y. July 8, 2015) (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

A motion to dismiss for sovereign immunity under the Eleventh Amendment is properly brought pursuant to Rule 12(b)(1) as the Eleventh Amendment "reflects 'the fundamental principle of sovereign immunity [that] limits the grant of judicial authority in Art. III.'" *Seminole Tribe of Fla. V. Fla.*, 517 U.S. 44, 64 (1996) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984)).

    b. The State Defendants' Rule 12(b)(1) Motion to Dismiss is Granted

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
U.S. Const. amend. XI. "The Supreme Court has long held that the Eleventh Amendment bars suits against a state by one of its own citizens, unless (1) the state consents to be sued, or (2) Congress validly abrogates the state's immunity." *Ross v. City Univ. of New York*, 211 F. Supp. 3d 518, 525 (E.D.N.Y. 2016) (citing *Coll. Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999)). But the Supreme Court established a third exception in *Ex parte Young*, 209 U.S. 123 (1908), allowing "prospective injunctive relief . . . against individuals being sued in their official capacities in order to correct an ongoing violation of federal law." *JTE Enterprises, Inc. v. Cuomo*, 2 F. Supp. 3d 333, 340 (E.D.N.Y. 2014) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)).

Here, the state has not consented to be sued, therefore the first exception does not apply. As for the second exception, abrogation, the Second Circuit has found that

> RCRA clearly contemplates that aggrieved citizens may bring suit to enforce its provisions where applicable. Section 6972 states that "any person may commence a civil action on its own behalf . . . against any person, including the United States any other governmental instrumentality or agency, to the extent permitted by the [E]leventh [A]mendment to the Constitution" to redress violations of RCRA. As this language makes clear, however, RCRA does not abrogate Eleventh Amendment immunity.

*Farricielli v. Holbrook*, 215 F.3d 241, 245 (2d Cir. 2000) (internal citation omitted). The Second Circuit has held that the same is true for CERCLA, which contains a "substantially identical provision[] permitting citizens to sue as private attorneys general in circumstances where government authorities have, after notice, failed to take steps to remedy particular environmental harms. . . . These provisions do not unequivocally express Congress's intent to abrogate sovereign immunity, these provisions are expressly limited by the Eleventh Amendment."

*Burnette v. Carothers*, 192 F.3d 52, 57 (2d Cir. 1999).  Therefore, the second exception does not apply either.

The final exception only applies if Plaintiff seeks prospective injunctive relief to correct an ongoing violation of federal law pursuant to *Ex parte Young*.  However, the Supreme Court has explained that this exception only contemplates action brought against individual defendants in their official capacities, and "has no application in suits against the States and their agencies, which are barred regardless of the relief sought."  *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).  Thus, there are no exceptions to the Eleventh Amendment that apply to Defendants the State of New York and the N.Y. State Department of Environmental Conservation, so all claims against these Defendants are dismissed based on sovereign immunity.

The only claims that remain against the State Defendants are those brought against the individuals sued in their official capacities, namely: Governor Cuomo, Basil Seggos in his official capacity as Commissioner of the New York State Department of Environmental Conservation, Martin Brand in his official capacity as Deputy Commissioner of the N.Y. State Department of Environmental Conservation, and Carrie Meek Gallagher, in her official capacity as Regional Director for Region 1 of the N.Y. State Department of Environmental Conservation (collectively, the "Individual Defendants").  The Court will now consider whether the *Ex parte Young* exception applies to these individual defendants.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct 'a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Maryland, Inc. v. Public Service Comm'n of Md.*, 535 U.S. 635, 645

(2002) (quoting *Idaho v. Coer d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)); *see also Riley v. Cuomo*, 2018 WL 1832929, at *4 (E.D.N.Y. Apr. 16, 2018) (citing the same). Simple as this may seem, the Court must conduct this analysis through the lens that the Eleventh Amendment still "bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 456 U.S. 89, 101 (1984) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)); *see also Gomez v. Stonybrook Univ.*, 2016 WL 1039539, at *13 (E.D.N.Y. Jan. 28, 2016) (quoting the same). "[A]s when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst*, 465 U.S. at 102 (citing *Cory v. White*, 457 U.S. 85, 91 (1982)). "The general rule is that a suit is against the sovereign if 'the judgment would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Pennhurst*, 465 U.S. at 102 n.11 (quoting *Dugan v. Rnak*, 372 U.S. 609, 620 (1963)). The Second Circuit has acknowledged that "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* is not as clear cut as the brightness of high noon and the darkness of midnight" and that "sovereign immunity is not invoked simply because prospective injunctive relief ultimately results in a diminution of state funds." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 375 (2d Cir. 2005). Where the "ancillary effect of the injunctive relief" is a payment from the state treasury, the *Ex parte Young* exception to sovereign immunity likely still applies. *Id.*

In the case at bar, Plaintiff asks the Court to order: (1) "an immediate and complete investigation of the contamination of radioactive materials in the subsurface and indoor air emanating from the Bethpage Facilities . . . to be performed by Plaintiff;" (2) "a formal

feasibility study to be performed by Plaintiff . . . ;" (3) "Defendants to select an adequate and proper remedial alternative . . .with substantial participation of the Plaintiff;" (4) "Defendants to issue a remedial decision or Record of Decision with substantial participation of the Plaintiff;" (5) "Plaintiff to timely implement the necessary remedial actions based on the feasibility study and the remedial decision;" (6) "Navy to fund the costs associated with the above items . . .;" (7) Plaintiff's counsel to act as administrator "of all investigatory and remedial activity" and compensate Plaintiff's counsel at "5% of amounts disbursed;" and (8) an award of Plaintiff litigation fees and civil penalties. (Am. Compl. ¶¶ a–k.) Putting aside the Court's concerns that this type of remedy appointing private counsel to oversee a government remediation pursuant to CERCLA and RCRA seems to be unprecedented, and may be barred by the very statutes this action seeks to enforce, the majority of the relief sought compels *Plaintiff* to act and requires everything to be paid for out of the public treasury. Of the eight demands, all but three—Demands 3, 4, and 6—relate to Plaintiff's actions. Demand 6 explicitly asks for Defendants to pay for the other demands, in effect asking the Court to compel Defendants to pay for Plaintiff's actions. Thus, the cost to the state is not the "ancillary" result of a prospective injunction compelling state officials to carry out their duties. Rather, the cost is an integral component of the relief explicitly sought by Plaintiff and is in large part the actual relief sought by Plaintiff. This is especially true given that Plaintiff asks the Court to order Defendants to <u>pay</u> for Plaintiff to conduct the studies and oversee the remedial activities, rather than asking the Court to order Defendants to carry out these actions. *See, e.g.*, *In re Dairy Mart*, 411 F.3d at 375 (explaining that when the action is in essence for recovery of funds it is barred by the Eleventh Amendment, but an injunction requiring state officials to carry out their duties that results in the expenditure of funds as an ancillary effect of such prospective relief falls within the *Ex parte Young*

exception). The only demands that could be construed as possibly comporting with *Ex parte Young* are Demands 4 and 5. However, both seek "substantial participation of Plaintiff" and are therefore interwoven with Plaintiff's request for compensation and for the Court to order Plaintiff to act. Thus, there are no claims for prospective injunctive relief for which cost is an ancillary effect. Accordingly, this action as it is brought against the individual state defendants is truly against the State as the real, substantial party Therefore, this matter does not fall within the *Ex parte Young* exception.

Plaintiff asserts that where *Ex parte Young* applies, the state is automatically *not* the true party. (Mem. in Opp. [ECF No. 49] at 34.) However, none of the cases Plaintiff cites for this proposition say this. *See, e.g.*, *In re Dairy Mart*, 411 F.3d at 375 (as quoted and expounded upon above). Moreover, Plaintiff's circular argument has no bearing on this motion to dismiss as *Ex parte Young* does not apply. Therefore, the State Defendants' motion to dismiss is granted. The Court will not address the State Defendants' other argument regarding contribution under RCRA as it has been rendered academic.

II.      *The Federal Defendants' Motion to Dismiss*

Federal Defendants move to dismiss pursuant to Rule 12(b)(1) on the basis that thia action is barred by the limits on judicial review set forth in CERCLA § 113(h), which provides in relevant part that:

> No Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under section 9604 ["104"] of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:
>
>      1) An action under section 9607 of this title to recover response costs or damages or for contribution.
>      (2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.
>      (3) An action for reimbursement under section 9606(b)(2) of this title.

> (4) An action under section 9659 of this title (relating to citizen suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.
> (5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

42 U.S.C. § 9613(h). Plaintiff does not claim that this action falls within one of these exceptions. (*See* Mem in Opp. at 5.) Rather, Plaintiff asserts that the cleanup/investigatory actions are being conducted under CERCLA §§ 107 and 120, rather than § 104, and therefore the jurisdictional bar under § 113 does not apply. (*Id.*) Plaintiff cites to Executive Order 12580, which delegates the President's power over CERCLA § 104(a) and (b) actions to the Secretaries of Defense and Energy "with respect to releases or threatened releases where either the release is on or the sole source of the release is from any facility or vessel under the jurisdiction, custody, or control of their departments . . . ." Exec. Order 12580 ¶ 2(d), 52 Fed. Reg. 2924 (Jan. 23, 1987). Plaintiff contends that because the source of the Plume is from both a State and a non-State entity, and because the Plume has migrated off government-owned property, Defendant's clean-up efforts outside of the NWIRP site are not covered by E.O. 12580. (*Id.*) Moreover, Plaintiff argues that Defendant Navy is not conducting a removal or remedial action but is instead only undertaking preliminary due diligence. (*Id.*) The Federal Defendants counter that the response action at the Bethpage Facilities has been undertaken pursuant to the Defense Environmental Restoration Program ("DERP"), 10 U.S.C. §§ 2700–2711, which functions together with § 104 and is thus barred from judicial review by § 113(h). There is no dispute that the Plume contains co-mingled contaminants that from a Federal and non-Federal source. Therefore, the question before the Court is whether the geographic range of the Plume that is outside of the NWIRP site fits within

the meaning of a facility under the jurisdiction, custody, or control of the Federal Defendants under E.O. 12580.

In 1986, Congress enacted the DERP statute to "carry out a program of environmental restoration at facilities under the jurisdiction of the Secretary" of Defense. 10 U.S.C. § 2701. DERP sets out the Secretary of Defense's responsibilities for responses as follows:

> The Secretary shall carry out (in accordance with the provisions of this chapter and CERCLA) all response actions with respect to releases of hazardous substances from each of the following:
> (A) Each facility or site owned by, leased to, or otherwise possessed by the United States and under the jurisdiction of the Secretary.
> (B) Each facility or site which was under the jurisdiction of the Secretary and owned by, leased to, or otherwise possessed by the United States at the time of action leading to, or otherwise possessed by the United States at the time of actions leading to contamination by hazardous substances.
> (C) Each vessel owned or operated by the Department of Defense.

10 U.S.C. § 2701(c)(1). The DERP provides that the terms "facility" and "release" "have the meanings given those terms in section 101 of CERCLA. *Id.* § 2700(2). CERCLA defines the term "facility," in relevant part, to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located[.]" 42 U.S.C. § 9601(9). CERCLA defines the term "release" to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment[.]" *Id.* § 9601(22). Courts have found that "[t]he term 'leaching' within that definition 'is commonly used to describe passive migration[.]'" *New York v. Next Millennium Realty, LLC*, 160 F. Supp. 3d 485, 507 (E.D.N.Y. 2016) (quoting *ABB Indus. Systems, Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 358 (2d Cir. 1997)).

The Parties agree that the NWIRP site falls squarely within the scope of E.O. 12580 and the definition of a facility under DERP. As explained above, Plaintiff challenges whether the

geographic range of the Plume that is outside the NWIRP falls within the scope of E.O. 12580 and § 104. (*See, e.g.*, Mem. in Opp. at 18.) The term "facility" is not defined in E.O. 12580, nor does the Executive Order cross-reference any other legislation for definitions. Even if the Court reads the CERCLA definition for a facility into E.O. 12580 ("any site or area where a hazardous substance has . . . otherwise come to be located"), its applicability is still constrained by the requirement that the site be under the jurisdiction, custody, or control of the Department of Defense ("DOD"). This provision in E.O. 12580 is difficult to reconcile with the language in § 2701(c)(1) stating that DERP applies to "*all* response actions with respect to *releases* of hazardous substances from" a DOD-controlled facility. As a "release" is defined to include leaching, and leaching has been interpreted to include passive migration, the DERP should logically apply to the clean-up of passive migration from a federally-owned or operated facility, whether or not those releases have stayed on a federal facility. This interpretation is reinforced by the DOD's own guidance in the DERP Management Manual, which provides that "DERP includes all environmental restoration activities undertaken by a DOD Component" including:

> At a facility or site that is not on real property that is or was owned by, leased to, or otherwise possessed by the United States and under the jurisdiction of the Secretary of Defense, provided that contamination attributable to the DOD has migrated from (e.g. by groundwater flow) . . . a site [owned by, leased to, possessed or under the jurisdiction of the DOD]. This can include contamination attributable to DOD whether or not it has commingled with contamination attributable to another source.

DERP Management Manual (March 9, 2012) at 16 – 17, available at https://www.navfac.navy.mil/content/dam/navfac/Specialty%20Centers/Engineering%20and%20Expeditionary%20Warfare%20Center/Environmental/Restoration/er_pdfs/gpr/dod-ev-man471520-derpmgmt-20120309.pdf. "Although the interpretation of an ambiguous statute by the agency charged with its enforcement is ordinarily entitled to great deference . . . statutory interpretation is, in the final

analysis, a matter for the courts." *Estrella v. P.R. Painting Corp.*, 2007 WL 9709943, at *6 (E.D.N.Y. Apr. 21, 2007) (quoting *Rosario v. INS*, 962 F.2d 220, 222 (2d Cir. 1992)).

Neither Plaintiff nor Defendants proffer any case law from the Second Circuit addressing this question. However, the Federal Defendants do cite to a California case in support of their assertion that E.O. 12580 should apply to a release from a Federal facility that has comingled with contaminants from other sources and is on property that is not federally-controlled. *City of Fresno*, 709 F. Supp. 2d 888, 921 (E.D. Cal. 2010). In *City of Fresno*, the Eastern District of California considered environmental remediation activities at a site that was then-occupied by an airport but had previously been used as an army base during World War II. 709 F. Supp. 2d at 892. In the interim, the site was rented by Boeing's predecessor, North American Aviation. *Id.* The hazardous substances at the site included two industrial solvents, and the related plume extended "12,000 feet long, up to 4,000 feet wide at points, and up to 300 feet deep at points." *Id.* at 893. The Eastern District of California does not specify in its decision which of the parties contributed to the contamination, but based on the cost-sharing "Cooperative Agreement" discussed therein it seems that both the Army and North American Aviation discharged hazardous substances. *See id.* In *City of Fresno*, the plaintiff argued that the clean-up was proceeding pursuant to § 120, while the defendant United States countered that the clean-up was proceeding pursuant to E.O. 12580 and the DERP statute. The Eastern District of California held that the cleanup was proceeding under E.O. 12580 and the DERP statute, not § 120, because the property was not federally owned at the time of the cleanup. The Eastern District of California does not provide any further discussion on the scope or application of E.O. 12580.

The facts in *City of Fresno* are similar to the facts at bar insomuch as both cases involve hazardous substances that were released by the DOD at DOD properties, plumes that have spread

far beyond the original property, and co-mingled contaminants. The Court notes that this is a close call with convincing evidence on both sides. In light of the Eastern District of California's holding in *City of Fresno*, the language of § 2701(c) read together with the definitions in CERCLA, the guidance in the DERP Manual, and the lack of any other instructive precedent on this issue, the Court finds that the scales tip in the Federal Defendants' favor. Accordingly, the Court holds that the Federal Defendants' cleanup activities related to the Bethpage Facilities Plume fall within the scope of E.O. 12580 and DERP even where the Plume has extended beyond the NWIRP site.

Courts in other districts have found that 10 U.S.C. § 2701(c) "functions together with CERCLA § 104" such that "[a]]ll the evidence points to the applicability of [§ 104], which falls under the jurisdictional bar of [§ 113(h)]." *City of Salina v. United States*, 2011 WL 1107107, at *4 (D. Kan. March 25, 2011); *see also Cannon v. Gates*, 438 F.3d 1328 (10th Cir. 2008) ("Although the President has delegated most of his authority under CERCLA to the EPA, he has delegated his authority over Department of Defense sites instead to the Secretary of Defense. Pursuant to the authority, the Secretary cleans up 'formerly used defense sites' pursuant to the [DERP]. Title 10 U.S.C. § 2701(c) requires the Secretary to undertake action in response to such hazardous waste sites in accordance with CERCLA. Therefore, the parties concede that the [DERP] 'uses a cleanup process consistent with CERCLA and the National Contingency Plan . . .' and thus, that [§ 104] and [§ 113(h)] apply to this case") (internal citations omitted); *City of Fresno*, 709 F. Supp. 2d at 921 (Explaining that "the cleanup is proceeding under E.O. 12580 and the DERP statute, implicating § 104, not § 120" and going on to dismiss the action pursuant to § 113(h)). It seems that the Second Circuit has not addressed this question, and neither Plaintiff nor Defendants indicate otherwise. Nevertheless, the Court is persuaded by the

case law in other Circuits and agrees that the DERP statute implicates § 104. Therefore, the instant cleanup efforts are protected from judicial review § 113(h). Section 113(h) extends to challenges brought under both CERCLA and RCRA, so this action is dismissed in its entirety. *See Camillus Clean Air Coalition v. Honeywell Intern., Inc.*, 947 F. Supp. 2d 208, 216 (N.D.N.Y. 2013) (citing *Clinton Cty. Comm'rs v. U.S. E.P.A.*, 116 F.3d 1018, 1020 (3d Cir. 1997)).

Finally, the Court will briefly address Plaintiff's argument that the Federal Defendants investigations are too indefinite to constitute a removal action that triggers § 113(h). The Court has found that the cleanup efforts at issue in this action fall under § 104. Section 104(b) provides that "whenever the President has reason to believe that a release has occurred or is about to occur . . . he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof[.]" 42 U.S.C. § 9604(b)(1). The Southern District of New York has previously held that "testing and other investigative measures" qualify as a removal action under § 104. *Smith v. Potter*, 208 F. Supp. 2d 415, 420 (S.D.N.Y. 2002). Again, this appears to be a question of law that is underdeveloped in this Circuit and others. Here, the Court finds that the language of § 104(b) and the rationale in *Smith* demonstrate that the Federal Defendants' investigations into radium constitute a removal action under § 104.

The Court is unpersuaded by Plaintiff's assertion that the Federal Defendants must first determine that the radium is *not* naturally-occurring under § 104(a)(3) before the investigation comes within the ambit of § 104(b). This logic is a legal paradox because Plaintiff is essentially stating that the Federal Defendants cannot undertake an investigation under § 104(b) until they are already certain of the result of such investigation. Section 104(b) establishes that the President only needs "reason to believe" that a release has occurred in order to begin an

investigation thereunder. Therefore, the Court finds that the Federal Defendants' investigations have been carried out pursuant to § 104(b). Likewise, the Court declines to consider Plaintiff's arguments citing unrelated provisions of CERCLA and nonbinding precedent from other Circuits.

Accordingly, the Federal Defendants' motion to dismiss is granted in its entirety. Plaintiff is not given leave to re-plead its claims or to add a § 120(h) claim because all of the Defendants are protected by either sovereign immunity or CERCLA's bar on judicial review, and amending the Complaint will not give this Court subject matter jurisdiction.

## CONCLUSION

For the reasons set forth above, the State Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) is granted based on sovereign immunity. Furthermore, the Federal Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) is granted based on the bar on judicial review in CERCLA § 113(h). Accordingly, the matter is dismissed and the Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

Dated: Central Islip, New York
       March 22, 2019

                                    /s/
                                Denis R. Hurley
                                Unites States District Judge